## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| )<br>UNITED STATES OF AMERICA, )<br>ex rel. DEVYN TAYLOR, )<br>)<br>Plaintiff/Relator, )<br>)<br>v. )<br>)<br>GMI USA Corp., )<br>BELOVEFINE, Ltd.; )<br>STEFANO MARONI, )<br>)<br>Defendants. )<br>) | 16 CV 7216 (PGG)<br><br>**FIRST AMENDED COMPLAINT**<br>For damages and other relief<br>Under the False Claims Act<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     This is both a *qui tam* action brought against defendants GMI USA Corp. ("GMI"), Belovefine, Ltd. ("Belovefine"), and Stefano Maroni ("Maroni"), (collectively, "Defendants") under the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA" or the "Act") to recover damages and civil penalties on behalf of the United States of America ("United States") and relator Devyn Taylor ("Taylor" or "Relator"), as well as an FCA whistleblower retaliation action brought against Defendants GMI and Belovefine on behalf of Taylor.

2.     In addition to damages and civil penalties, Taylor also seeks to recover the maximum relator's share and attorney's fees, expenses, costs, prejudgment interest, reinstatement and other relief permitted under the FCA.

3.    The FCA *qui tam* allegations in this amended complaint ("First Amended Complaint") arise from Defendants' misconduct and practices concerning their importation of footwear into the United States.

4.    Specifically, Defendants, acting on their own, and in concert with others, including, but not limited to, their importer of record and certain overseas manufacturers, knowingly submitted, or caused others to submit, false and fraudulent entry documents to government Customs agents and representatives at United States ports of entry. These entry documents misrepresented the tariff classifications and corresponding duty rates and amounts owed for footwear manufactured in foreign countries, including China and Vietnam, and shipped to the United States.

5.    By using such false entry documents Defendants were able to wrongfully reduce the correct amount of customs duties owed to the United States under various customs statutes and regulations, in violation of 31 U.S.C. § 3729(a)(1)(G) and 31 U.S.C. § 3729(a)(1)(C).

6.    Upon information and belief, based on various sources, including Relator's communications with other employees of Defendants, as well as her own observations as an employee of Defendants, the above-described practice occurred from at least as early as 2006 through at least as late as the end of 2018.

7.     As a result of the foregoing, the United States suffered economic losses and is entitled to combined treble damages and maximum civil penalties in the millions of dollars, the precise amount of which will be determined at trial.

8.     The FCA retaliation allegations, made pursuant to 31 U.S.C. § 3730(h), arise from Defendants' mistreatment of Taylor after she initially raised questions with Defendant Maroni about Defendants' customs duty fraud practices and later refused to participate in them.

9.     Defendants' mistreatment included Maroni throwing a stapler at Taylor's head, which missed her, throwing a pen at Taylor, which hit her, screaming at Taylor in the presence or vicinity of other employees and threatening to terminate her employment if she did not help Maroni defraud Customs. Defendants' misconduct also included attempting to force Taylor to train a substitute employee to perform the unlawful acts Taylor refused to do.

10.     This extreme and outrageous employment misconduct created such severe and intolerable conditions that Taylor ultimately was forced to quit her job, resulting in a constructive discharge from employment.

11.     As a result of Defendants' gross mistreatment of Taylor, she suffered economic damages, including loss of wages due to prolonged unemployment, as well, as non-economic harm and consequential damages, the nature and amounts of which will be determined, and doubled where appropriate, at trial.

## PARTIES, ENTITIES AND PERSONS

### Relator

12.     Relator Taylor is a resident of the State of Connecticut.

13.     Taylor was employed by GMI/Belovefine as a Production Manager in Defendants' New York City office for approximately eight months beginning in early January 2016 and ending on or about August 23, 2016.

14.     Taylor has first-hand knowledge of, and participated in, certain practices and transactions that are encompassed within the allegations of this First Amended Complaint.

### The United States

15.     The United States, acting through the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection agency ("CBP" or "Customs"), is the real party-plaintiff-in-interest in *qui tam* claims this action.

16.     Custom's headquarters are located at 1300 Pennsylvania Avenue, NW, Washington, DC. 20229. Customs also maintains a document processing office at 1 Bowling Green, New York, NY 10004, and various port offices throughout the United States, including ones at 1210 Corbin Street, Elizabeth, NJ 07201 (for the Port of New York/Newark, New Jersey, also identified by Port Code 4601) and 301 E. Ocean Blvd., Suite 1400, Long Beach, CA 90802 (for the Los Angeles/Long Beach Seaport, California, also identified by Port Code 2704).

## **GMI**

17.     Defendant GMI is a privately-owned New York domestic business corporation.

18.     GMI was formed in 2005.

19.     GMI's principal office is currently located at 3 Columbus Circle, Suite 2410, New York, NY 10019, where it is a subtenant of Defendant Belovefine. At times relevant to this action, GMI's principal offices were also located at 3 Columbus Circle, Suite 2100, New York, NY 10019 (which is also where Taylor worked), 71 Gansevoort Street, Ste 3/3d Floor, New York, NY 10014, 231 W. 39th Street, Rm 500 New York, NY 10018, and 141 West 36th Street, 17th Floor, New York, New York 10018.

20.     At all times relevant to this First Amended Complaint, GMI licensed the rights to design, source, manufacture, distribute and sell footwear in the United States under various brand names, including, but not limited to, Ben Sherman, Tommy Bahama, Levi's, Michael Bastian Footwear, True Religion, 7 For All Mankind and Land's End.

21.     At all times relevant to this First Amended Complaint, GMI sold footwear, including men's, women's, and children's dress shoes, boots, lifestyle shoes and athletic shoes (also referred to as sneakers or tennis shoes), primarily to "off price" stores, including, but not limited to, T.J. Max, Nordstrom Rack, Saks Off

Fifth, Marshalls, and Burlington, who in turn sold the footwear to retail consumers at either the customers' brick and mortar stores or through their on-line websites.

22.    At all times relevant to this First Amended Complaint, all of the footwear GMI sold in the United States had been manufactured in, and shipped from, one of the following foreign countries: China, Vietnam, India and Italy.

23.    At most times relevant to this First Amended Complaint, the footwear GMI sold in the United States entered the country by ship at either the Port of New York/Newark, New Jersey (Port 4601) or the Seaport of Los Angeles/Long Beach, California (Port 2704). Occasionally, GMI entered its footwear by air through JFK International Airport because of time constraints or other business reasons.

24.    At most times relevant to this First Amended Complaint, after GMI's footwear entered the United States, it was unloaded and stored at local warehouses before being trucked to GMI's wholesale customers' distribution warehouses.

25.    At most times relevant to this First Amended Complaint, GMI brought footwear into the United States in shipping containers, each of which required a separate customs entry form.

26.    During the timeframe relevant to this First Amended Complaint, GMI typically imported into the United States approximately 20 to 40 forty-foot containers of footwear annually. Each container typically contained between five and 15 different styles of footwear, designated by a unique stock keeping unit

6

number (or "SKU"). Since each style/SKU number of footwear required separate entry documents, Defendants typically presented between 100 and 912 sets of entry documents to Customs annually.

### Belovefine

27.    Defendant Belovefine is a privately-owned New York domestic business corporation.

28.    Belovefine was formed in 2012.

29.    Belovefine's principal office is currently located at 3 Columbus Circle, Suite 2410, New York, NY 10019, where it is the tenant of record. At times relevant to this action, Belovefine's principal offices were also located at 3 Columbus Circle, Suite 2100, New York, NY 10019, 71 Gansevoort Street, Ste 3/3d Floor, New York, NY 10014, 231 W. 39th Street, Rm 500 New York, NY 10018, and 141 West 36th Street, 17th Floor, New York, New York 10018.

30.    Defendant Belovefine's business location, structure, staffing, management, ownership and activities are, and have always been, coterminous with those of Defendant GMI.

31.    As a both practical and legal matter, Belovefine and GMI are indistinguishable alter-egos of each other. Unless otherwise indicated, this First Amended Complaint will use the name "GMI" to mean and refer to both entities.

**Maroni**

32.    Defendant Maroni resides, or at various times relevant to this action resided, in a condominium located at 985 Park Avenue, New York, New York 10028.

33.    Maroni also listed 985 Park Avenue, New York, New York 10028 as his place of contact on filings with the New York State Secretary of State concerning corporate Defendants GMI and Belovefine.

34.    At all times relevant to this First Amended Complaint, Maroni was the owner, operator and Chief Executive Officer ("CEO") of Defendants GMI and Belovefine.

35.    At all times relevant to this First Amended Complaint, Maroni exercised exclusive, complete and unfettered domination and control over both Defendants GMI and Belovefine and all of their business activities.

**Non-Party Samsung**

36.    Samsung C&T America, Inc., ("Samsung" or "SCTA") is a New York corporation with headquarters that are, or have been, located at either 105 Challenger Road, 3d Floor, or 85 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 076602, and maintains New York City offices located at 1430 Broadway, 22nd Floor, New York, New York 10018. Samsung's importer number registered with CBP is 13-2834199TS.

37.    At all times relevant to this First Amended Complaint, Samsung was the "importer of record" for all the footwear Defendants imported into the United States and appeared as such on Defendants' Customs entry documents.

38.    At all times relevant to this First Amended Complaint, Samsung either purchased from the manufacturer, or financed GMI's purchase of, all the foreign-made footwear Defendants imported into the United States.

39.    At all times relevant to this First Amended Complaint, Samsung warehoused all of the footwear Defendants imported into the United States, either at Samsung's own facilities or with third parties.

40.    In or about February 2023, Samsung acknowledged that at various times between May 2016 and December 2018 it acted "in conjunction with GMI" to misclassify GMI-imported footwear on customs entry documents in order to underpay customs duties.

41.    Samsung publicly admitted and accepted responsibility for this conduct and agreed to pay the United States $1 million to settle the Government's False Claims Act allegations against Samsung. The filing of Relator's original *qui tam* complaint in this action led to the Government's investigation of Samsung and the ensuing settlement. As a result, Taylor received a relator's share award from the Government for her role in commencing this action and furthering a successful resolution with Samsung.

### Non-Party Spano

42.     Michael R. Spano & Co. Inc. ("Spano") is a licensed Customs broker with its principal offices located at 190 McKee Street, Floral Park, New York 11001.

43.     At various times relevant to this First Amended Complaint, Spano was the customs broker, authorized agent and entry summary "declarant" for footwear Defendants imported into the United States and appeared as such on Defendants' Customs entry documents.

44.     At various times relevant to this First Amended Complaint, in its capacity as customs broker, Spano help Defendants "clear" all of Defendants' imported footwear for entry into the United States by, among things, preparing the required entry documents and calculating the customs duties owed for the footwear.

45.     At various times relevant to this First Amended Complaint, Spano relied exclusively on information provided to it by Defendants (or Samsung acting on behalf of Defendants) to prepare the required customs entry documents and calculate the customs duties owed for footwear Defendants imported into the United States.

46.     At various times relevant to this First Amended Complaint, Spano physically submitted the required entry documents to Customs for footwear Defendants imported into the United States.

## Non-Party Worldwide

47.    Worldwide Logistics Ltd. ("Worldwide") is a third-party logistics company, with its headquarters located at 3611 109th Street, Des Moines, Iowa 50322, and NYC-area offices located at 80 Route 4 East, Suite 410, Paramus, NJ 07652 and 25 E. Spring Valley Ave, Suite 205, Maywood NJ 07607.

48.    At all times relevant to this First Amended Complaint, Worldwide functioned as Defendants' freight forwarder. In that capacity, Worldwide oversaw and coordinated the shipping and transportation of footwear Defendants imported into the United States.

49.    Beginning in or about 2018, Worldwide replaced Spano and became Defendants' customs broker, in addition to serving as Defendants' freight forwarder.

## Non-Party Foreign Manufacturers

50.    BAOFA/Hua Yang Shoes ("BAOFA") is a footwear manufacturer with a factory located in Guangzhou, China.

51.    At times relevant to this First Amended Complaint, BAOFA was one of the principal manufacturers of footwear Defendants imported into the United States.

52.    FOSHAN/Himway International, Ltd. ("FOSHAN") is a footwear manufacturer with a factory located in Guangzhou, China.

53.    At times relevant to this First Amended Complaint, FOSHAN was one of the principal manufacturers of footwear Defendants imported into the United States.

54.    Supergrace Limited ("Supergrace") is a footwear manufacturer with a factory located in China.

55.    At times relevant to this First Amended Complaint, Supergrace was one of the principal manufacturers of footwear Defendants imported into the United States.

56.    FT International/FT Vietnam ("FT International") is a footwear manufacturer with a factory located in Ho Chi Min City, Vietnam.

57.    At times relevant to this First Amended Complaint, FT International was one of the principal manufacturers of footwear Defendants imported into the United States.

## JURISDICTION AND VENUE

58.    The court has original subject matter jurisdiction over the FCA *qui tam* and retaliation claims alleged in this First Amended Complaint under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1340 (revenue from imports), and/or 31 U.S.C. § 3732(a) (False Claims Act).

59.    The court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, or transact business in

this district. Section 3732(a) of the FCA further provides for service of process at any place within or outside the United States.

60.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants can be found, reside, and transact business in this district; acts proscribed by 31 U.S.C. § 3729 and § 3730(h) occurred within this district; and a substantial part of the events or omissions giving rise to the *qui tam* and retaliation claims alleged in this First Amended Complaint occurred in this district.

## FCA SUBJECT MATTER JURISDICTION

61.     Relator brings this action pursuant to the *qui tam* provisions of the Act, 31 U.S.C. 3730(b).

62.     Upon information and belief, none of the subject matter or other jurisdictional bars or preclusions set forth in Section 3730 of the FCA is applicable to this action.

63.     Upon information and belief, prior to any "public disclosure" (as defined by the FCA), Relator voluntarily disclosed to the United States Attorney's Office for the Southern District of New York on, and before, August 23, 2016, the information on which the allegations or transactions in this this First Amended Complaint are based.

64.     Through her employment by Defendants, Relator is an "original source" of the information on which her allegations are based, within the meaning of the FCA.

65.     Prior to filing this action, on and before August 23, 2016, Relator voluntarily disclosed to the United States Attorney's Office for the Southern District of New York the information on which the allegations or transactions in this First Amended Complaint are based.

66.     After Relator's initial preliminary disclosure of the allegations on which her First Amended Complaint is based, and prior to any public disclosure, Relator provided additional details of related information and transactions during in person meetings and/or telephonic communications with the United States Attorneys' Office for the Southern District of New York, as well as through her attorney's telephonic and email communications with that office.

## LIABILITY UNDER THE FCA

67.     The FCA, 31 U.S.C. § 3729, provides that a person is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410, which is currently set at a minimum of $13,508 and a maximum of $27,018), plus three times the amount of damages which

the Government sustains because of an act of that person, if, among other things, the person violates the FCA.

68.    31 U.S.C. § 3729(a)(1)(G), the FCA's so-called "reverse false claims provision," specifically and expressly creates liability under the FCA where a person: "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money ... to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money ... to the Government."

69.    Section 3729(b)(1) of the Act defines the terms "knowing" and "knowingly" to

> (A) mean that a person, with respect to information—
>
> (i) has actual knowledge of the information;
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

70.    Section 3729(b)(3) of the Act defines the term "obligation" to mean, among other things, an established duty ... arising from ... statute or regulation."

71.    Section 3729(b)(4) of the Act defines the term "material" to mean, among other things, "having a natural tendency to influence, or be capable of influencing, the ... receipt of money."

72.     To prevail on a customs duty-based reverse false claim under 31 U.S.C. § 3729(a)(1)(G), a relator must establish: (1) a fraudulent course of action or a false statement, (2) made with the requisite degree of knowledge, (3) that was material, (4) causing the Government to forfeit moneys due. See *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017).

73.     Section 3729(a)(1)(C) of the Act provides, in part, that any person who "conspires to commit a violation of subparagraph…(G)" of the FCA is liable for violating the Act.

74.     Section 3730(h) of the Act, provides, in part:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.
>
> Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h).

## **CUSTOMS DUTIES LAWS, REGULATIONS AND FORMS**

### **Mod. Act**

75.    The Customs Modernization Act of 1993 ("Mod. Act") fundamentally altered the relationship between importers and CBP by shifting to the importer the legal responsibility for declaring the value, classification, and rate of duty applicable to entered merchandise.

76.    In short, declaring proper duties owed is now largely an "honor system," one in which the United States government relies heavily on the integrity of importers to truthfully report, among other things, the correct tariff classifications for imported merchandise.

77.    Under the Mod. Act and related Customs rules and regulations, all importers, including Defendants, have a corresponding obligation to know their Customs entry obligations. And they have a related obligation to seek clarification from Customs if and when there is any doubt about how to prepare and submit truthful and correct entry documents. See also Part 177 of 19 C.F.R.

78.    Additionally, all importers, including those importing footwear, have been instructed to submit requests for Customs rulings to the Director, National Commodity Specialist Division Regulations and Rulings 201 Varick Street, Suite 501 New York, New York 10014, if they have any questions concerning duty issues, including those relating to classification of footwear. See "What Every Member of

the Trade Community Should Know: Footwear," An Informed Compliance Publication, U.S. Customs and Border Protection(First Published January 1998; last revision September 2017); see also *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63-66, 104 S. Ct. 2218, 2225-27 (1984) (holding that participants in activities affecting the public fisc have an obligation to familiarize themselves with the legal requirements for such activities).

## **HTSUS**

79.     The United States International Trade Commission ("USITC") devises, maintains and publishes a detailed Harmonized Tariff Schedule of the United States ("HTSUS," or sometimes shortened to "HTS") for each classification of merchandise imported into the United States.

80.     The HTSUS codes for footwear are found under headings 6401 through 6405.

81.     Within each of the footwear codes there are numerous sub-codes.

82.     The HTSUS schedule is comprised principally of three columns: the designation of an HTSUS code, a description of the merchandise, and a listing of the corresponding rate of duty.

83.     For example, according to the HTSUS (2023 revision 1) the stated duty for HTSUS code 6401.10.00, which corresponds to "footwear incorporating a protective metal toe-cap," is 37.5%.

### Entry Documents: Form 7501, Invoice and IFI

84.     Title 19, United States Code, Section 1484 requires every "importer of record" to enter merchandise with Customs using documentation that enables the agency to, *inter alia,* properly assess duties on the merchandise.

85.     The principal document used to enter merchandise into the United States is the Customs Entry Summary, also designated as CBP Form 7501 ("Form 7501").

### Form 7501

86.     A Form 7501 must be filed with Customs for every shipment of merchandise imported into the United States. Relator does not possess and cannot access as of the date of this First Amended Complaint the Forms 7501 relevant to this action.

87.     Among other things, since at least June 2009, a properly completed Form 7501shows the Port Code for the place of entry (field 6) and the Entry Date (field 7), as well as the Country of Origin (field 10) and the Manufacturer ID (field 13). The Form 7501 also requires the importer of record (identified in fields 23 by number and 26 by name) to accurately describe the merchandise (field 28), assign the correct HTSUS code (field 29), list the duty rate corresponding to the HTSUS code (field 33) and calculate the right amount of duties and excise taxes owed (field 34). Where more than one model or style of merchandise is contained in a single

import shipment, there must be separate line items for fields 28 through 34 for each model or style.

88.    Form 7501 further includes a signed declaration in which the importer of record or its authorized agent (identified by name in field 41) states that all the information on the form is "true and correct" to the best of the declarant's knowledge. Form 7501 (fields 36 and 41).

89.    Typically, a Form 7501 is prepared and filed with Customs on behalf of the importer of record by a CBP-licensed customer's broker, whose identity is shown in field 42.

## Invoice/Commercial Invoice

90.    Importers of record are further required to submit an invoice to Customs with each shipment along with the Form 7501. 19 C.F.R. § 141.81. Typically, this means a "commercial invoice." 19 C.F.R. § 141.83.

91.    Among other things, the invoice/commercial invoice is required to contain a full and accurate description of the merchandise, including its quantity and price or value and other details about the merchandise's origin and importation. 19 C.F.R. § 141.86.

92.    Whenever the classification or appraisement of merchandise depends on the component materials, the invoice/commercial invoice is also required to set forth a breakdown of the value, weight, or other necessary measurement of each

component material in sufficient detail to determine the correct duties. 19 C.F.R. §
141.87.

93.    Typically the invoice/commercial invoice is prepared by the foreign
manufacturer/seller and sent to the importer at the time of shipment. The importer,
in turn, typically provides the invoice/commercial invoice to its customs broker to
be given to Customs upon entry.

94.    Typically    the    importer's    customs    broker    relies    on    the
invoice/commercial invoice in determining the proper duty rate and amount on
imported merchandise.

## IFI

95.    Under Customs regulations certain types of merchandise, including
footwear, require supplemental information with the invoice/commercial invoice.
See 19 C.F.R. § 141.89.

96.    Since 1989, Customs has required importers of footwear to satisfy the
supplemental disclosure requirements of 19 C.F.R. § 141.89 by completing and
filing with Customs (along with a Form 7501 and an invoice/commercial invoice)
an International Footwear Association Footwear Retailers of America Interim
Footwear Invoice ("Interim Footwear Invoice" or  "IFI," and also known as a
"Footwear Declaration").

97.    A separate IFI must be submitted to Customs at the time of entry for each style of footwear being imported into the United States.

98.    The IFI, which should be signed by the manufacturer, importer of record, or authorized agent, requires the importer to, among other things, correctly identify or state:

a.    The materials making up the so-called "upper" of the footwear, meaning, whether they are leather, composition leather, rubber and/plastics, textile materials or other.  IFI form, Section A, item 3.

b.    The materials making up the external surface of the sole of the footwear. IFI form, Section A, item 4.

c.    Whether the height of the upper (1) covers the knee or higher, (2) the ankle but not the knee, or (3) does not cover the ankle. IFI form, Section A, item 9.

d.    Whether or not the footwear has "foxing" or a "foxing-like band" applied or molded at the sole and overlapping the upper. IFI form, Section B, item 15.

e.    And, if so, whether the foxing or foxing-like band wholly or almost wholly of rubber or plastics. IFI form, Section B, item 16.

f.    Whether the footwear possesses any of the following characteristics (1) sods, (2) made on a base or platform of wood, (3) made on a base

or platform of cork, (4) open toes or open heels, (5) exclusively adhesion construction, (6) slip-on type, or (7) none of the above. IFI form, Section B, item 17.

99.   Typically the IFI is prepared by the foreign manufacturer and sent to the importer at the time of shipment.

100.   The importer, in turn, typically provides the IFI to its customs broker, who includes the IFI with the other Customs entry documents in order to "clear" the goods.

101.   Typically the importer's customs broker relies on the detailed information stated on the IFI to assign the correct HTSUS code and apply the proper duty rate on imported footwear.

102.   The HUTSUS codes and corresponding duty rates for footwear can, and do, vary substantially depending on the nature of the footwear's material, type of construction and characteristics.

103.   For example, a shoe with a majority textile upper, according to the IFI, might be assessed a duty of 9% of the value of the shoe. Whereas a shoe with a majority rubber/plastics upper, according to the IFI, might be assessed a duty of 20% of the value of the shoe plus 90 cents per pair of shoes.

## CUSTOMS FOOTWEAR DUTY FRAUD MATERIALITY

104.   Falsifying the HTSUS tariff classification codes, duty rates and duty amounts owed for imported footwear on Customs entry documents, including on the Form 7501, invoice/commercial invoice and/or IFI, is material to CBP.

## FCA LIABILITY FOR FOOTWEAR CUSTOMS DUTY FRAUD

105.   The information importers are directed to include on the Form 7501, invoice and IFI and filed with Customs at the time of entry is mandatory and central to Customs' calculation and receipt of the correct duty owed to the United States for each shipment.

106.   Knowingly providing Customs with false information on a Form 7501, invoice/commercial invoice or IFI that has the effect of understating the correct amount of duty owed on imported footwear is an actionable false claim under 31 U.S.C. § 3729(a)(1)(G), which establishes FCA liability for any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money ... to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money ... to the Government.

31 U.S.C. § 3729(a)(1)(G).

107.   Engaging in concerted action with others to commit Customs duty fraud on footwear, in violation of 31 U.S.C. § 3729(a)(1)(G), is also actionable under 31 U.S.C. § 3729(a)(1)(C), which establishes liability for any person who "conspires to commit a violation of subparagraph ... (G)."

## **FACTUAL ALLEGATIONS**

### **General Factual Allegations Concerning Duties Fraud**

108.   From at least as early as 2006 to as late as the end of 2018, Defendants committed Customs duty fraud by misclassifying footwear they imported into the United States. Defendants did so to pay lower duties than were required by Customs laws, rules and regulations.

109.   During this timeframe, every pair of footwear Defendants sold in the United had been purchased from an overseas manufacturer (mainly from factories in China and Vietnam) and imported into the United State (primarily at the Port of New York/Newark, New Jersey or Seaport of Los Angeles/Long Beach, California).

110.   For the footwear to be cleared to enter the United States for sale to GMI's wholesale customers, Defendants' custom broker Spano presented to Customs the requisite entry documents, comprised chiefly of a Form 7501, commercial invoice, IFI and shipping manifest. On each Form 7501 Samsung was listed as the Importer of Record on the Forms 7501.

111.   Often the Forms 7501 assigned an incorrect HTSUS code to a particular style of GMI's footwear. This had the effect of improperly lowering the amount of duty owed.

112.   Spano inputted wrong HTSUS codes on many Forms 7501 filed with Customs for Defendants because Defendants, or their employees or agents, had given Spano false information about certain models or styles of footwear.

113.   Defendants typically did this by providing Spano with IFIs that misrepresented the type of materials and/or construction used in manufacturing the footwear.

114.   More specifically, Defendants or their employees or agents often put false and incorrect information in fields 3, 4, 9, 15, 16 and/or 17 of the IFIs.

115.   Defendants did this by causing the overseas factories to falsify the IFIs around the time of the shipments and/or by altering the IFIs after Defendants received the IFIs from the manufacturers, including, but not limited to, by whiting out the correct information on the IFI and inputting false information in its place.

116.   Defendants knew the information on the IFIs was false because, among other things, when the footwear had been designed and readied for production, Defendants created footwear "line sheets" that contained photographs and descriptions of the various styles and models of footwear. The footwear line sheets also typically included the true and correct duty rates for each style. In some instances, Defendants further knew the IFIs and corresponding HTSUS codes were wrong because Spano had advised Defendants or their employees or agents which

merchandise descriptions, HTSUS codes and duty rates were correct and which were incorrect for a given footwear style.

117.   To broadly summarize the details of Defendants' scheme to commit duty fraud, it was customs broker Spano, acting at the direction of Defendants and their employees or agents, who repeatedly submitted false and fraudulent entry documents (Forms 7501, invoices/commercial invoices and IFIs) to Customs. The false entry documents were submitted at the Customs port offices located at or near either the Port of New York/Newark, New Jersey (Port 4601) or the Los Angeles/Long Beach, California Seaport (Port 2704), depending on whether the ships carrying containers of Defendants' footwear landed in either California or New York/New Jersey. The entry documents were false and fraudulent because they misclassified the material composition and/or construction of Defendants' footwear in order to obtain a more favorable HTSUS code number and thereby allow Defendants to pay lower duties than were required by Customs laws, rules and regulations.

118.   Spano misrepresented the merchandise description, HTSUS code, duty rate and duty owed on the Forms 7501 (specially, fields 28, 29, 33 and 34) because Defendants' employees or agents gave Spano employees false information about the footwear, principally through IFIs with incorrect information in fields 3, 4, 9, 115, 16, and/or 17.

119.   Among other things, Defendants regularly misclassified footwear by making the following misrepresentations (either individually or in various combinations):

a.    The footwear had "foxing," or a "foxing-like band," that is, is a strip of material, separate from the sole and upper, that secures the joint where the upper and sole meet, which is usually attached by a vulcanization process or by cementing or stitching, when, in fact, the footwear did not have foxing or a foxing-like band.

b.    The footwear did not have "foxing," or a "foxing-like band," when, in fact, the footwear did have foxing or a foxing-like band.

c.    Over 90% of the external surface area of the footwear's "uppers" were rubber or plastics materials (including, polyurethan or "PU"), when, in fact, they were textile materials.

d.    Over 90% of the external surface area of the footwear's "uppers" were textile materials, when, in fact, they were rubber or plastics.

e.    The footwear's uppers were constructed of textile materials, when, in fact, they were constructed of either rubber or plastics materials.

f.    The greatest portion of the footwear's sole in contact with the ground was made up of a rubber or plastics material, when, in fact, the majority of the footwear's sole in contact with the ground was made up of textile materials.

g.     The greatest portion of the footwear's sole in contact with the ground was made up of a textile materials, when, in fact, the majority of the footwear's sole in contact with the ground was made up of rubber or plastics materials. And/or

h.     The sole had been "flocked," when, in fact, it had not." Flocking refers to the process of depositing or spraying many small fiber particles (called flock) onto the footwear's surface to create a special stylish faux leather fabric and appearance).

i.     GMI falsified IFIs by stating footwear had flocking on the bottom sole of the shoe, when, in fact, the footwear had textile uppers and or canvas with rubber soles and were priced under $12.00 freight on board ("FOB"), which misrepresentation brought the duty rate down to 12.5% instead of 20% plus 90 cents per pair.

j.     GMI falsified IFIs by stating footwear had textile uppers when, in fact, the footwear had "PU" (i.e., polyurethane plastic material) uppers, covered the ankle and were priced under $12.00 FOB, which misrepresentation brought the duty rate down to 9% instead of 20% plus 90 cents per pair.

k.     GMI falsified IFIs by stating footwear had foxing or a foxing-like band that secures the joint where the upper and sole meet, when in fact the

footwear did not have foxing or a foxing-like band, which, misrepresentation brought the duty rate down to 12.5% instead of 37.5%.

120.  Although not limited to specific brands and models or styles, Defendants' misclassification of their imported footwear occurred with particular frequency for the following name brands, styles and SKUs:

    a.    **<u>BEN SHERMAN</u>**

       i.  Knox BN7S000059

      ii.  Lox BN7S00160

     iii.  Oxford Parnell BNM00009 and BN7S00157

     iv.  Oxford Presley BN7S00057

      v.  New Jenson Sport Slide/BN7S00041-

     vi.  New Prill Sport Slide/BN7S00141

    vii.  New Jenson Lace Up/BN7S00043

   viii.  New Prill Lace Up/BN7S00143

     ix.  New Jenson Chukka/BN7S00044

      x.  New Prill Chukka/BN7S00144

     xi.  James Sneaker/BN7S00045

    xii.  Jayme Sneaker/BN7S00145

   xiii.  Percy Slip On/BN7S00046

   xiv.  Pete Slip On/BN7S00146

    xv.  Ron Sneaker/BN7S00047

    xvi.  Rhett Sneaker/BN7S00147

    xvii.  Percy Hi Chukka/BN7S00048

    xviii.  Pete Hi Chukka/BN7S00148

    xix.  Stevie/BN7S00049

    xx.  Steven/BN7S00149

    xxi.  Lorin Signature Sneaker/BN7S00053

    xxii.  Ashton Signature Sneaker/BN7S00153

    xxiii.  Presley Slip-On/BN7S00056

    xxiv.  Parnell Slip-On/BN7S00156

    xxv.  Preston Penny Loafer/BN7S00062

    xxvi.  Payton Penny Loafer/BN7S00162

    xxvii.  Vaughn/BN7S00063

    xxviii.  Vance/BN7S00163

    xxix.  Victor/BN7S00064

    xxx.  Vince/BN7S00164

    xxxi.  Winston Low Profile Sneaker/BN7S00055

    xxxii.  Wayne Low Profile Sneaker/BN7S00155

    b.  **<u>TOMMY BAHAMA</u>**

        i.  Espadrilles

      c.   **LEVI'S**

121.   The above- described fraud occurred on each and every instance when Spano presented entry documents to Customs with incorrect HTSUS codes and related customs duty information that allowed Defendants to knowingly underpay their customs duty obligations.

**Specific Factual Allegations Concerning Defendants' Custom Duty Fraud
Government Complaint in Intervention**

122.   The Government's complaint in intervention against Samsung in this matter, see ECF No. 14 ("Complaint in Intervention"), lists four specific instances when Samsung acted in conjunction with GMI to import footwear into the United States with false classifications for duty purposes. *Id*. at 8-12.

123.   Specifically, the Complaint in Intervention references the following transactions:

      a.   On August 8, 2016, in connection with entry number G1301090214, Defendants' broker Spano represented on the Form 7501 that the imported footwear should be classified under HTSUS code 6402.99.3145, when, in fact, the correct code was 6402.99.8031.

      b.   On February 24, 2017, in connection with entry number G1301118437, Defendants' broker Spano represented on the Form 7501 that the

imported footwear should be classified under HTSUS code 6402.99.3145, when, in fact, the correct code was not 6402.99.3145.

     c.    On March 27, 2017, in connection with entry number G1301121035, Defendants' broker Spano represented on the Form 7501 that the imported footwear should be classified under HTSUS code 6404.11.8590, when, in fact, the correct code was 6402.99.8031. And,

     d.    The March 27, 2017 Form 7501 further stated that a second line of shoes comprising the shipment should be classified under HTSUS code 6402.99.3145, when, in fact, this was not the correct code.

124.  According to the Complaint in Intervention, these four examples, whose underlying documents Relator does not possess and cannot access as of the date of this First Amended Complaint, "represent only a small subset" of the footwear entered by Defendants' importer of record Samsung with misclassified HTSUS codes and/or inaccurate duty-related information about the footwear, at the behest of Defendants in the years 2016 through 2018.

125.  The Complaint in Intervention also attaches an appendix ("Appendix A") listing approximately 312 Form 7501 entry numbers corresponding to Customs entries and Forms 7501where Defendants reportedly underpaid duties through the scheme described in this First Amended Complaint. Upon information and belief, each of the 312 separate Forms 7501, contains precise and highly-detailed

information showing who made the false representations in fields 36 and 41 (namely, Spano or its employee or representative), where these false statements were made in field 6 (that is, either Port 4601 or Port 2704, depending on whether the entry occurred on the east coast or west), when the false statements were made in field 7 (namely, the entry date) and what made them false in fields 28, 29, 33 and 34 (specifically, improper descriptions of the footwear, incorrect HTSUS codes, wrong duty rates and erroneous calculations of duty owed).

126. Relator incorporates by reference the Complaint in Intervention, including the four specific examples cited above, as well as Appendix A, and the approximately 312 Customs entries which it lists.

### Four Additional Specific Examples

127. Below are four additional illustrative examples of Defendants' violations of the FCA:

a.     In connection with the entry of Ben Sherman brand Mens Vaughn Boot Athletic Shoes, SKU number BN6F00018 ("Mens Vaughn Boots"), Defendants initially filled out an IFI that correctly checked the box in field 3 indicating the upper was predominantly "rubber and/or plastics," but then one of Defendants' employees whited out that checkmark and falsely checked the box indicating the upper was predominantly "textile materials."

b.     The IFI referenced above further indicates that Defendants wrongly classified the Mens Vaughn Boots under HTSUS code 6402.99.3145, when, in fact, that was not the correct code.

c.     Defendants provided this falsified IFI to Spano on or about August 12, 2016, and Spano used the IFI to calculate an improper duty rate on a Form 7501 shortly thereafter.

d.     In connection with the entry of Ben Sherman brand Mens Knox sneaker, style number, BN400229 ("Mens Knox Sneaker"), Defendants initially filled out an IFI that correctly checked the box in field 15 indicating the shoe had a "foxing like band" but then one of Defendants' employees falsely checked the box indicating it did not have a "Foxing Like Band."

e.     The IFI referenced above further indicates that Defendants wrongly classified the Mens Knox Sneaker under HTSUS code 6402.99.3145 with a duty of 6%, when, in fact, that was not the correct code. The correct code was 6402 99 8031 with a duty of 20% +90 cents.

f.     Upon information and belief, Defendants provided this falsified IFI to Spano in or about April 2016, and Spano used the IFI to calculate an improper duty rate.

g.     In connection with the entry of Ben Sherman brand Mens Victor sneaker, style number, BNM00009 ("Mens Victor Sneaker"), Defendants initially

filled out an IFI that correctly checked the box in field 15 indicating the shoe had a "foxing like band" but then one of Defendants' employees falsely checked the box indicating it did not have a "Foxing Like Band."

h.     The IFI referenced above further indicates that Defendants wrongly classified the Mens Victor Sneaker under HTSUS code 6402.99.3145 with a duty of 6%, when, in fact, that was not the correct code. The correct code was 6402 99 8031 with a duty of 20% +90 cents.

i.     Upon information and belief, Defendants provided this falsified IFI to Spano in or about April 2016, and Spano used the IFI to calculate an improper duty rate.

j.     In connection with the entry of Ben Sherman brand Mens Prill and Jensen Slipon sneaker, style number, BN7S00041 and BN7S00141 ("Mens Prill and Jensen Slipon Sneaker"), Defendants initially filled out an IFI that correctly checked the box in field 4 indicating the external surface of the shoe was a "Rubber and or plastics" but then one of Defendants' employees falsely checked the box indicating it did not have a "TPR with Flocking."

k.     The IFI referenced above further indicates that Defendants wrongly classified the Men's Victor Sneaker under HTSUS code 6404.19.3730 with a duty of 12.5%, when, in fact, that was not the correct code. The correct code was 6404 19 3940 with a duty of 37.5%.

l.    Upon information and belief, Defendants provided this falsified IFI to Spano in or about April 2016, and Spano used the IFI to calculate an improper duty rate.

**Factual Allegations Concerning Defendants' Scienter**

128.   As importers Defendants had a duty to familiarize themselves with the legal requirements for the lawful importation of merchandise and the payment of duties.

129.   Upon information and belief, based on a review of Customs' online Customs Rulings Online Search System ("CROSS"), except for one occasion on October 23, 2018, Defendants never sought a ruling or clarification from Customs as to the proper HTSUS classifications or duty rates for the footwear that is the subject of this action. And on that one occasion, the Customs National Import Specialist ("NIS") disagreed with Defendants' request, made through Worldwide, to classify Oxford Parnell Men's Shoe Style BNM00009 under HTSUS code 6402.99.3145, with a duty rate of 6%, and ruled that the correct HTSUS code was 6402.99.8031, with a duty of "90 cents/pair + 20 percent ad valorem."

130.   On many occasions, Spano employees told Defendants' employees and managerial/executive personnel in meetings, via emails and/or in telephone calls that Defendants were misclassifying for duty purposes footwear Defendants were importing into the United States. For example, as referenced in the Complaint in

Intervention (at ¶¶ 25 and 26), on or about April 18, 2016, Spano notified a Samsung manager and others (including, but not limited to Relator, her assistant at GMI, a product development coordinator at GMI and GMI's former COO) that Spano had "repeatedly advised that if a shoe has a foxing (rubber band around the bottom overlapping the upper) [i]t can't be brought in at 6%." Rather, assuming the value of the shoe was under $12.00, the duty rate would be "20% + .90 [cents per pair]." Spano added that unless the footwear was accompanied by documentation indicating "that the shoe does not have a foxing and that it is over 90% rubber/plastic [the duty rate] will never be 6%." Notwithstanding this stern warning, Defendants thereafter misclassified certain footwear using a 6% duty HTSUS code, specifically, 6402.99.3145.

131.   On numerous occasions, Defendants' employees, including, but not limited to, Relator, alerted Defendants and their employees and agents, including Maroni, that Defendants were misclassifying footwear on entry documents. As but one specific example, on August 12, 2016, Relator sent an email to GMI's Chief Operating Officer ("COO"), in which Relator said, in sum and substance, that Defendants were asking her to falsify an IFI by stating that the footwear model had a textile upper, when, in fact, it was "PU" (plastic), in order to improperly bring the duty rate down from 20% to 9%. And, in response, the COO told Relator to do just

that. Upon information and belief, the COO's response was made at the behest and instruction of Defendant Maroni, either directly or indirectly.

132.   Maroni's reaction to Relator's alerts about Defendants' misclassifications of imported footwear and use of improper customs duty rates are discussed in the following section.

### **Factual Allegations Concerning Whistleblower Retaliation**

133.   Relator realleges and incorporates all allegations in this First Amended Complaint as though fully set forth herein.

134.   Taylor began working for Defendants at GMI's New York City offices in or about early January 2016.

135.   Her position was Production Manager.

136.   Taylor terminated her employment with Defendants on or about August 23, 2016.

137.   During her employment, Taylor discovered Defendants were committing Customs duty fraud.

138.   Specifically, she learned Defendants were misclassifying (or causing others to misclassify) footwear on numerous Customs entry documents, including, many of the IFIs Defendants were transmitting to Spano for filing with CBP.

139.   Taylor became extremely concerned about the unlawfulness of Defendants' fraudulent Customs duty activities and her participation in them.

140.   On several occasions, Taylor voiced, or otherwise raised, her concerns about Defendants' Customs duty fraud schemes with various employees, agents and representatives of Defendants, including, most notably, Defendant Maroni.

141.   Many times when Taylor communicated with Maroni, in sum and in substance, about Defendants committing Customs duty fraud, Maroni became enraged and threatening towards Taylor.

142.   As but one example, in or about March or April 2016, Maroni threw a stapler at Taylor's head, but missed hitting her.

143.   On another occasion, Maroni threw a pen at Taylor and hit her.

144.   There were a number of occasions when Maroni screamed at Taylor in front, or within earshot, of other GMI employees.

145.   Maroni told Taylor more than once, in sum and in substance, that if she did not participate in Defendants' scheme to defraud Customs she would lose her job, knowing full well Taylor had just given birth to a baby only a few months earlier and needed the income from her employment with Defendants to help support her family.

146.   Notwithstanding the forgoing, Taylor finally refused to go along with Defendants' scheme to commit Customs duty fraud.

147.   Thereafter, Maroni tried to force Taylor to train another of Defendants' employees to do the illegal acts she refused to perform.

40

148.   As a result of the ways Maroni mistreated Taylor for raising issues with, and refusing to assist in, Defendants' Customs duty fraud activities, Taylor was compelled to quit her job.

149.   This led to a substantial period of unemployment and resulted in considerable emotional and psychological distress for Taylor.

## CLAIMS FOR RELIEF

### COUNT I

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(G)  (Reverse False Claims)

150.   Relator realleges and incorporates all allegations in this First Amended Complaint as though fully set forth herein.

151.   The FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3129(a)(1)(G).

152.   By fraudulently undervaluing duties owed on footwear imported into the United States through misrepresentations on Forms 7501, invoices and IFIs submitted to customs on their behalf or for their benefit, Defendants knowingly avoided, concealed and decreased the importer of record's obligation to pay the full

statutory duties imposed on those imports and caused the United States to suffer actual damages, all in violation of 31 U.S.C. § 3129(a)(1)(G).

## COUNT II

### As to All Defendants

### Violation of 31 U.S.C. § 3729(a)(1)(C)  (Conspiracy)

153.   Relator realleges and incorporates all allegations in this First Amended Complaint as though fully set forth herein.

154.   The FCA imposes liability on any person who, among other things, "conspires to commit a violation of subparagraph ... (G)."   31 U.S.C. § 3729(a)(1)(C).

155.   By acting in concert between and among themselves and others, including, their importer of record, and overseas manufacturers who were aware of Defendants' fraud and agreed to further the scheme by helping to falsely undervalue customs duties owed on imported footwear, Defendants caused the United States to suffer actual damages, all in violation of 31 U.S.C. § 3729(a)(1)(C).

## COUNT III

### As to Defendants GMI and Belovefine

### Violation of 31 U.S.C. § 3730(h)  (Whistleblower Retaliation)

156.   Relator realleges and incorporates all allegations in this First Amended Complaint as though fully set forth herein.

157.   Section 3730(h) of the Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of lawful acts done by that person in furtherance of an action under the Act or other efforts to stop one or more violations of Act.

158.   Constructive discharge is covered by, and is actionable under, Section 3730(h).

159.   Defendant Maroni's actions on behalf of Defendants GMI and Belovefine against Taylor after she raised concerns about Defendants' scheme to commit Customs duty fraud and her eventual refusal to participate in it, including by her compelled self-termination of employment, were prohibited by Section 3730(h).

160.   Taylor suffered economic and non-economic damages as a result of Defendants GMI's and Belovefine's unlawful retaliatory conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, acting on behalf of, and in the name of, the United States pursuant to 31 U.S.C. § 3730(b), and on her own behalf pursuant to 31 U.S.C. § 3730(h) demands and prays that judgment be entered in favor of the United States and Relator and against Defendants as follows:

## As to Counts I and II

1. For treble the amount of the United States' damages, plus the maximum statutory penalties for each false claim or false statement;

2. For all costs of this civil action;

3. For prejudgment interest. And further,

4. Relator, on her own behalf, demands and prays that an award be made in her favor as follows: for 25 percent (25%) of any recovery by the United States if it intervenes in and conducts this action, or for 30 percent (30%) of any recovery if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by Relator in prosecution of these claims; for all reasonable attorneys' fees, expenses and costs incurred by Relator in pursuing these claims; and such other and further relief to which Relator is entitled.

## As to Count III

1. For all economic and non-economic damages and consequential damages suffered by Relator, doubled where appropriate under the FCA, and with prejudgment interest.

2. For reinstatement.

3. For an amount for reasonable expenses necessarily incurred by Relator in prosecution of this claim; for all reasonable attorneys' fees, expenses and costs

incurred by Relator in pursuing this claim; and such other and further relief to which Relator is entitled.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Relator demands that this case be tried before a jury.

Dated:  March 6, 2023
         New York, NY

/s/ Timothy J. McInnis
Timothy J. McInnis, Esq.  [7151]
McInnis Law
521 5th Avenue, 17th Floor
New York, NY 10175-0038
Tel. (212) 292-4573
Fax (212) 292-4574
tmcinnis@mcinnis-law.com

*Attorneys for Relator*