UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA *ex rel.*,    :
DEVIN TAYLOR,                          :
                                       :
                   Plaintiff,          :
                                       :
            - against -                :
                                       :
                                       :
GMI USA CORP., BELOVEFINE, LTD., and   :
STEFANO MARONI,                        :
                                       :
                   Defendants.         :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/26/2024

16-CV-7216 (RWL)

**DECISION AND ORDER:
MOTION TO DISMISS**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff-Relator Devin Taylor ("Taylor" or "Plaintiff") asserts claims against

Defendants GMI USA Corp. ("GMI"), Belovefine, Ltd. ("Belovefine"), and Stefano Maroni

("Maroni"), under the False Claims Act, 31 U.S.C. § 3729, et seq. to recover damages

and civil penalties on behalf of the United States and herself.  Taylor alleges that the

Defendants conspired to and did engage in a scheme to misrepresent the tariff

classifications and corresponding United States Customs ("Customs") duties owed to the

government for footwear imported into the United States.  Taylor also alleges individually

that Defendants GMI and Belovefine constructively discharged her in retaliation for

objecting to Defendants' illegal practices.

When Taylor filed her initial complaint as a relator,[1] she named only GMI as a

defendant, although non-party Samsung C&T America Inc. ("Samsung") was the importer

---

[1] "The [Federal Claims Act] is an anti-fraud statute that 'may be enforced not just through
litigation brought by the Government itself, but also through civil *qui tam* actions that are
filed by private parties, called relators, 'in the name of the Government.'"  *United States
ex rel. Chorches for Bankruptcy Estate of Fabula*, 865 F.3d 71, 81 (2d Cir. 2017).  "Qui

of record for the footwear.  The United States filed a complaint in partial intervention (the "Government Complaint") naming Samsung as the only defendant and entered into a settlement agreement with Samsung pursuant to which Samsung agreed to pay one million dollars in restitution and penalties under the False Claims Act (the "Samsung Settlement").  Despite receiving $210,000 of the Samsung Settlement amount for having served as relator, Taylor filed a First Amended Complaint ("FAC"), dropping Samsung as a defendant and adding Belovefine and Maroni as defendants along with GMI.

The parties have consented to my jurisdiction for all purposes.  Defendants now move to dismiss the FAC in its entirety pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim.  For the following reasons, Defendants' motion is denied.

## BACKGROUND[2]

### A.   The Parties And Non-Parties

GMI, located in New York City, is a privately-owned company that licensed the rights to design, source, manufacture, distribute, and sell footwear in the United States under various brand names, such as Tommy Bahama and Land's End.  (FAC ¶¶ 17-20.) GMI sells footwear to "off-price" stores such as Nordstrom Rack and Marshalls.  (*Id.* ¶

---

tam' means 'who as much as.' The phrase is taken from the longer Latin expression 'qui tam pro domino rege quam pro se ipso hac parte sequitur,' meaning 'who brings the action for the king as well as for himself.'" *Moor-Jankowski v. Board of Trustees of New York University*, No. 96-CV-5997, 1998 WL 474084, at *10 n.2 (S.D.N.Y. Aug. 10, 1998) (citing *Erickson v. American Institute of Biological Sciences*, 716 F. Supp. 908, 909 n.1 (E.D.Va.1989) (citing W. Blackstone, Commentaries on the Law of England, 160 (1768)).

[2] The facts recited by the Court are based on the First Amended Complaint ("FAC"), Dkt. 18, the well-pled allegations of which the Court must accept as true for purposes of the instant motion and for which the Court draws reasonable inferences in favor of Taylor as the non-moving party.  *See* Legal Standards section below.

21.)  The footwear is made abroad by third-party manufacturers in China, Vietnam, and other countries and imported into the United States.  (*Id.* ¶¶ 22, 26, 50-57.)  Belovefine, also a privately-owned company, is located at the same address as GMI; the two companies are "indistinguishable alter-egos of each other."  (*Id.* ¶¶ 19, 27-31.)  Maroni owns, operates, and is the Chief Executive Officer of both GMI and Belovefine, and exercises exclusive and complete domination and control over both entities.  (*Id.* ¶¶ 34-35.)  Taylor was employed by GMI and Belovefine as a Production Manager for less than a year, from early January 2016 to August 23, 2016.  (*Id.* ¶ 13.)

Samsung is the "importer of record" of the footwear at issue.  (*Id.* ¶ 37.)  Samsung either purchased from the manufacturer, or financed GMI's purchase of, the footwear. (*Id.* ¶ 38.)  Samsung also warehoused the footwear.  (*Id.* ¶ 39.)  Michael R. Spano & Co. Inc. ("Spano") was the customs broker, authorized agent, and "declarant" for purposes of clearing footwear that Defendants imported into the United States.  (*Id.* ¶¶ 43-44.)  Among other things, Spano prepared and submitted the required entry documents and calculated the customs duties owed.  (*Id.* ¶¶ 44, 46.)  Worldwide Logistics Ltd. ("Worldwide") oversaw and coordinated the shipping and transportation of the footwear Defendants imported and replaced Spano as Defendants' customs broker in 2018.  (*Id.* ¶¶ 48-49.)

## B.   Customs Duties And Forms

The principal document used to enter merchandise into the United States is the Customs Entry Summary, also designated as Form 7501.  (*Id.* ¶ 85.)  A Form 7501 must be filed with Customs for every shipment of goods into the United States.  (*Id.* ¶ 86.) Among other things, Form 7501 requires the importer of record to accurately describe the merchandise, list the corresponding duty rate, and calculate the correct amount of duties

and excise taxes owed.  (*Id.*  ¶ 87.)  The applicable duty rates are listed in the Harmonized Tariff Schedule of the United States ("HTS").  (*Id.*  ¶ 79.)  The codes for footwear are listed at HTS 6401 through 6405 and have numerous sub-codes.  (*Id.*  ¶¶ 80-81.)  Typically, Form 7501 is prepared and filed with Customs by a customs broker on behalf of the importer of record.  (*Id.*  ¶ 89.)

The classification and corresponding duties for footwear depend on the component materials of the footwear.  (*Id.*  ¶¶ 92, 98.)  The invoice accompanying the goods is required to set forth a breakdown of the value, weight, or other necessary measurement of each component material in sufficient detail to determine the correct duties.  (*Id.*  ¶ 92 (citing  19  C.F.R.  §  141.87).)  The  invoice  is  typically  prepared  by  the  "foreign manufacturer/seller" and sent to the importer at the time of shipment.  (*Id.*  ¶ 93.)  The importer in turn typically provides the invoice to its customs broker, who relies on the invoice in determining the proper duty rate and amount for the imported merchandise. (*Id.*  ¶ 94.)

Customs regulations require that the invoice for footwear be accompanied by supplemental information.  (*Id.*  ¶ 95 (citing 19 C.F.R. § 141.89).)  The supplemental information for footwear is provided in a document called an International Footwear Association Footwear Retailers of America Interim Footwear Invoice, known also as an "IFI" or "Footwear Declaration."   (*Id.* ¶¶ 96, 98.)  The Footwear Declaration requires correct identification of materials comprising the footwear's "upper" and external surface of the sole; whether the height of the upper covers the knee or ankle; whether the footwear has "foxing" applied or molded at the sole and overlapping the upper, and, if so whether the foxing is made wholly or almost wholly of rubber or plastics; and whether the footwear

possesses any of certain other characteristics.  (*Id.*  ¶ 98.)  Again, the foreign manufacturer typically prepares the Footwear Declaration and sends it to the importer, who provides it to the customs agent to determine the proper HTS codes and duty rates. (*Id.* ¶¶ 99-101.)

The duty rates can vary substantially depending on the nature of the footwear's material, type, construction, and characteristics.  (*Id.* ¶ 102.)  For example, a shoe with a majority textile upper might be assessed a duty of 9% of the value of the shoe, whereas a shoe with a majority rubber/plastics upper, might be assessed a duty of 20% of the value of the shoe plus 90 cents per pair of shoes.  (*Id.* ¶ 103.)

**C.    The Alleged Scheme**

The FAC alleges that from 2006 to the end of 2018, Defendants engaged in Customs duty fraud by misclassifying footwear imported into the United States so that they could pay lower duties than were required by Customs laws, rules, and regulations. (*Id.* ¶ 108.)

For each pair of footwear imported into the United States for sale to "GMI's wholesale customers," customs broker Spano prepared and submitted to Customs a Form 7501, invoice, Footwear Declaration, and shipping manifest.  (*Id.* ¶¶ 109-110, 112.) Samsung was listed as the importer of record on the Forms 7501.  (*Id.*  ¶ 110.)

Many of the HTS codes input by Spano, however, were incorrect "because Defendants, or their employees or agents" gave Spano Footwear Declarations containing false information about certain models or styles of footwear.  (*Id.* ¶¶ 111-14, 118.)  More particularly, "Defendants" either "caus[ed] the overseas factories to falsify the [Footwear Declarations] around the time of the shipments and/or … alter[ed] the [Footwear

Declarations] after Defendants received the [Footwear Declarations] from the manufacturers."  (*Id.* ¶ 115.)

The FAC identifies 11 misrepresentations made by Defendants in the Footwear Declarations.  Some misrepresentations directly contradict others.  For instance, on one hand, Defendants misrepresented that "[t]he footwear had 'foxing' or a 'foxing like band,' … when, in fact, the footwear did not have foxing or a foxing-like band," while, on the other hand, Defendants misrepresented that "[t]he footwear did not have 'foxing,' or a 'foxing-like band, when, in fact, the footwear did have foxing or a foxing-like band." (*Compare Id.* ¶ 119 (a) and (k), *with* (b).)   Similarly, on one hand, Defendants misrepresented that "[o]ver 90% of the external surface area of the footwear's 'uppers' were rubber or plastics materials … when, in fact, they were textile materials," while, on the other hand, Defendants misrepresented that "[o]ver 90% of the external surface area of the footwear's 'uppers' were textile materials, when, in fact, they were rubber or plastics."  (*Compare Id.* ¶ 119 (c) *with* (d), (e), and (j).)  And, on one hand, Defendants misrepresented that "[t]he greatest portion of the footwear's sole in contact with the ground was made of a rubber of plastics material, when, in fact the majority of the footwear's sole in contact with the ground was made up of textile materials," while on the other hand, Defendants misrepresented precisely the converse.  (*Compare Id.* ¶ 119(f) *with* (g).)

The only misrepresentation among the 11 identified that does not have a directly contradictory pairing concerns "flocking," which refers to the process of depositing or spraying small fiber particles (called flock) onto the footwear's surface to create a stylish faux leather fabric and appearance.  (*Id.* ¶ 119(h).)  Some of the Footwear Declarations

misrepresented that the sole had been flocked, when, in fact, it had not.  (*Id.* ¶ 119(h), (i).)

Incorporating allegations from the Government Complaint against Samsung, the FAC identifies in detail four specific instances "when Samsung acted in conjunction with GMI to import footwear into the United Sates with false classifications for duty purposes." (*Id.* ¶¶ 122-124.)  Additionally, the FAC identifies four examples of particular Footwear Declarations provided by Defendants to Spano in which Defendants initially checked a box indicating the correct composition or characteristic of the footwear, "but then one of Defendants' employees" checked a box falsely characterizing the footwear with respect to that same characteristic.  (*Id.* ¶ 127.)  The FAC also incorporates by reference an appendix to the Government Complaint listing 312 Form 7501 entry numbers where Defendants "reportedly" underpaid duties through the scheme described.  (*Id.* ¶¶ 124-26.) "Upon information and belief," each of the Forms 7501 show "who made the false representations … (namely Spano or its employee or representative based on information provided by Defendants)," where they were made, who made them, and what made them false.  (*Id.* ¶ 125.)

Defendants knew the information in the Footwear Declarations was false based on "line sheets" containing photographs and descriptions of, as well as the correct duty rates for, the footwear at the time the footwear was designed and readied for production.  (*Id.* ¶ 116.)  On many occasions, Spano employees advised Defendants' employees that Defendants were misclassifying the imported footwear and specifically identified for Defendants which merchandise descriptions, HTS codes, and duty rates were correct and which were not.  (*Id.* ¶¶ 116, 130.)  Defendants' own employees, including Taylor, also

alerted Defendants, including Maroni, that Defendants were misclassifying footwear on entry documents.  (*Id.* ¶ 131.)

## D.    Alleged Retaliation

During her employment in 2016, Taylor learned that Defendants were misclassifying, or causing others to misclassify, footwear on Customs entry documents. (*Id.* ¶ 139.)  On several occasions, Taylor raised her concerns with Maroni and other representatives of Defendants.  (*Id.* ¶ 140.)  In one example, on August 12, 2016, Taylor sent an email to GMI's Chief Operating Officer ("COO") explaining that Defendants were asking her to falsify a Footwear Declaration by stating that the footwear model had a textile upper, when, in fact, it was plastic, in order to improperly reduce the duty rate.  In response, the COO told Taylor "to do just that."  (*Id.* ¶ 131.)

In response to Taylor's raising concerns about misclassification, Maroni often became enraged and threatening toward Taylor, throwing a stapler at her head (although missing hitting her), and throwing a pen at her (which did hit her) on another occasion. (*Id.* ¶¶ 141-43.)  Maroni also yelled at Taylor and told her that if she did not participate in Defendants' scheme to defraud Customs, she would lose her job, "knowing full well Taylor had just given birth to a baby only a few months earlier and needed the income from her employment with Defendants to help support her family."  (*Id.* ¶ 145.)  When Taylor refused to go along, Maroni "tried to force" Taylor to train another employee to do the illegal acts she refused to perform.  (*Id.* ¶¶ 146-47.)  As a result of her treatment by Maroni, Taylor "was compelled" to quit her job.  (*Id.* ¶ 148.)  Taylor then was unemployed for a

substantial period and experienced considerable emotional and psychological distress. (*Id.* ¶ 149.)

E.    **Commencement Of The Action And Settlement With Samsung**

On September 15, 2016, Taylor commenced the instant *qui tam* action as a relator alleging violations of the False Claims Act.  (Dkt. 12.)  The complaint named only GMI as a defendant and charged GMI with causing to be submitted information that materially underreported the value of imported footwear to Customs.  (Dkt. 12.)  On February 3, 2023, the United States partially intervened and filed the Government Complaint against Samsung, the footwear's importer of record.  (Dkt. 14.)  That same day, the United States, Taylor, and Samsung entered into the Samsung Settlement, pursuant to which Samsung agreed to pay the United States one million dollars.  (Dkt. 13.)  As part of the Samsung Settlement, the United States and Taylor also entered into a Stipulation and Order awarding Taylor 21% of the settlement payment, or an amount of $210,000.  (Dkt. 16.)

The Samsung Settlement stipulation and order included admissions made by Samsung.   Among other things, Samsung admitted that from May 2016 through December 2018, Samsung "in conjunction with GMI, imported footwear from manufacturers based outside the United States," and that while Samsung was the "importer of record … responsible for paying customs duties," it "and GMI provided [Samsung]'s custom's brokers with invoices and other documents and information that purportedly reflected the tariff classification of the" footwear, which Samsung had reason to know were inaccurate.  (Dkt. 13 at ¶ 2.)  The Samsung Settlement expressly did not release GMI from any claims that may be asserted by Taylor relating to the misclassification conduct.  (Dkt. 13 at ¶ 7.)

**F.      The Amended Complaint And Instant Motion To Dismiss**

In the wake of the Samsung Settlement, Taylor filed the FAC, adding Belovefine and Maroni as defendants along with GMI.  The FAC asserts three causes of action:  (1) reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G) against all Defendants; (2) conspiracy to commit reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(C) against all Defendants; and (3) whistleblower retaliation in violation of 31 U.S.C. § 3730(h) against Defendants GMI and Belovefine.  As relief for the alleged substantive False Claims Act violations and conspiracy to commit the same, Taylor seeks treble the amount of damages to the United States, maximum penalties, costs, prejudgment interest, a percentage of any recovery by the United States through intervention, and reasonable attorney's fees.  (FAC at p.44, Counts I and II.)  As relief for her claim of retaliation under the False Claims Act, Taylor seeks economic and non-economic damages, reinstatement, costs, and reasonable attorney's fees.  (FAC at pp.44-45, Count III.)

On August 18, 2023, Defendants moved to dismiss the FAC for failure to state a claim, along with a supporting brief (Dkt. 52) ("Def. Mem.")  Taylor filed an opposing brief on September 1, 2023 (Dkt. 53) ("Pl. Mem."), and Defendants replied on September 8, 2023 (Dkt. 54) ("Def. Reply").  The Court held oral argument on January 23, 2024.  The motion is now ripe for decision.

**LEGAL STANDARDS**

**A.      Motion To Dismiss For Failure To State A Claim**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to state a cause of action, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the [non-moving party's] favor."  *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks omitted).  This tenet, however, is "inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, … i.e., enough to make the claim plausible."  *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks omitted).  A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint.  *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit.  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013).  In that regard, if

"a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Poindexter v. EMI Record Group Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012) (citing *Barnum v. Millbrook Care Limited Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994)).

## B.    Heightened Pleading Standard For FCA Claims

Because the False Claims Act is an anti-fraud statute, a complaint alleging violations of the Act must comply with the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure.  *Chorches*, 865 F.3d at 81.  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "That ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Chorches*, 865 F.3d at 81 (quoting *United States ex rel. Ladas v. Exelis*, 824 F.3d 16, 25 (2d Cir. 2016)).  "The point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Chorches*, 865 F.3d at 87 (quotation marks omitted); *see also Ladas* 824 F.3d at 25-26 (explaining that Rule 9(b) serves a number of "salutary purposes," including to (1) "provide a defendant with fair notice of a plaintiff's claim," (2) "safeguard a defendant's reputation from improvident charges of wrongdoing," and (3) "protect a defendant against the institution of a strike suit").

"[T]he adequacy of particularized allegations under Rule 9(b) is case- and context-specific."  *Chorches*, 865 F.3d at 81 (quoting *Espinoza ex rel. JP Morgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015) (ellipses omitted)).  Allegations of fraud "may be based on information and belief when facts are peculiarly within the opposing party's knowledge" so long as the complaint "adduce[s] specific facts supporting a strong inference of fraud."  *Chorches*, 865 F.3d at 81-82 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).  And, while Rule 9(b) "demands specificity, … it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility."  *Id.* at 88.

## DISCUSSION

### A.    Count I:  Reverse False Claims

Taylor's first cause of action is for reverse false claims against all Defendants.  The False Claims Act imposes liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money … to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money … to the Government."  31 U.S.C. § 3729(a)(1)(G).  Whereas claims under the False Claims Act often are based on using false information to ***obtain*** money from the Government, a reverse false claim is based on using false information to ***avoid paying*** money to the Government.  *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) ("Subsection (a)(1)(G) is referred to as the reverse false claims provision because it covers claims of money owed to the government, rather than payments made by the government") (quotation marks and citation omitted).  "[T]o state a claim for a reverse FCA violation a '[r]elator must allege

(1) the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government – a duty to pay money or property.'" *United States ex rel. Billington v. HCL Technologies Ltd.*, No. 19-CV-1185, 2022 WL 2981592, at *9 (D. Conn. July 28, 2022) (quoting *United States ex rel. Yu v. Grifols USA, LLC*, No. 17-CV-02226, 2021 WL 5827047, at *12 (S.D.N.Y. Dec. 8, 2021)).

The FAC sets forth facts establishing the requisite elements of a reverse false claims act and does so with the particularity demanded by Rule 9(b).  The FAC specifies the statements that the plaintiff contends were fraudulent: misclassification of footwear attributes on Footwear Declarations, which was intended to be and was used to complete Customs Forms 7501 setting forth false amounts for duties owed.[3]  The FAC specifies the individual form field numbers containing the false information (*e.g.*, FAC ¶¶ 114, 118), as well as 11 specific statements alleged to be false (*id.* ¶ 119).  The FAC provides specific examples of the transactions in which the false information was used with respect to both Forms 7501 (*id.* ¶ 123) and Footwear Declarations (*id.* ¶ 127), and incorporates a list of 312 Form 7501 entry numbers for which Defendants underpaid duties by virtue of the schemed alleged (*id.* ¶ 125).

The FAC also identifies the "speaker" or persons who made the false statements – specifically, the foreign manufacturers who supplied false information on the Footwear Declarations and the three Defendants, who allegedly knowingly falsified information by

---

[3] Misclassification of goods in order to lower Customs duties has been recognized as a viable basis for asserting a reverse false claims case under the False Claims Act.  *See United States ex re. Tamanaha v. Furukawa America, Inc.*, 445 F. App'x 992, 993-94 (9th Cir. 2011) (reversing district court's dismissal of complaint without opportunity to amend to provide further particularity); *United States ex rel. Winslow v. PepsiCo., Inc.*, No. 05-CV-9274, 2007 WL 1584197 (S.D.N.Y. May 30, 2007) (finding sufficient particularity and denying motion to dismiss).  Defendants do not contend otherwise.

altering information on the Footwear Declarations or otherwise knowingly passing along false information supplied by the manufacturers, and thereby caused customs broker Spano to use the false information to complete the Forms 7501 that were then submitted to Customs.   The FAC also specifies where the statements were made, identifying ports of entry by Customs number and geographical location (*e.g.*, FAC ¶¶ 23, 109), as well as when they were made – between 2006 and 2018 at the time the false information passed through Defendants and then was presented to Customs.   The examples described include the specific dates on which the false information was entered into the Forms 7501 (*Id.* ¶ 123), and the specific month when Defendants allegedly furnished to the customs broker Footwear Declarations that had been altered by Defendants (*id.* ¶ 127).

The FAC also explains in detail why the statements at issue are false.   In sum, the information in the Footwear Declarations does not accurately describe the characteristics of the footwear imported, and the information in the corresponding Forms 7501 understate the Customs duties owed.   (*E.g.*, *Id.* ¶¶ 4-5, 111-121.)   Finally, the FAC sets forth sufficient facts to establish Defendants' scienter (*e.g.*, *id.* ¶¶ 129-31) and the materiality of the false information (*e.g.*, *id.* ¶¶ 5, 45-46, 101-04).

Despite the specificity of the FAC, Defendants principally argue that "the FAC is riddled with internal inconsistencies, which render its allegations not well pled."   (Def. Mem. at ECF 10; Def. Reply at 2.)   Defendants identify five such inconsistencies: (1) allegations that Samsung imported the footwear vs. allegations that Defendants imported the footwear; (2) allegations that Samsung warehoused the footwear vs. allegations that Defendants warehoused the footwear; (3) allegations that Spano acted as customs broker for Samsung vs. allegations that Spano acted as customs broker for Defendants; (4)

allegations that the Footwear Declarations were created by the manufacturer, importer, or their agent vs. allegations that they were created by Defendants; and (5) allegations that Defendants reported foxing-like band where none existed vs. allegations that Defendants failed to report foxing-like band when present.  (*Id.* at 3.)

None of those purported inconsistencies, taken alone or together, render the FAC insufficiently well-pled.  First, the FAC consistently refers to Samsung as the "importer of record" on the entry documents.  (*E.g.*, FAC ¶¶ 4, 37, 110.)  The FAC also refers to Defendants as having imported footwear.  (*E.g.*, *Id.* ¶ 26, 49, 55.)  Defendants have not provided any basis for the Court to conclude that those propositions are mutually exclusive.  Samsung may be the importer of record identified on Customs entry documents, but that does not mean that Defendants could not also be deemed to have imported, or participated in importing, the footwear.  Similarly, there is no inconsistency with respect to the FAC's warehousing allegations.  The FAC alleges that all of the footwear Defendants imported were warehoused by Samsung.  (*Id.* ¶ 39.)  The paragraph that Defendants cite as being incompatible with that allegation merely says that "after GMI's footwear entered the United States, it was unloaded and stored at local warehouses."  (*Id.* ¶ 24.)  As the allegation is phrased in the passive voice, it does not identify any particular entity as being responsible for warehousing.  Nor is there inherent inconsistency in allegations that Customs broker Spano acted on behalf of both Defendants and Samsung.  And, the purported inconsistency in who "created" the Footwear Declarations is based on mischaracterizing the FAC's allegations.  The FAC alleges that Footwear Declarations are typically "prepared" by the manufacturer and sent to the importer at time of shipment (*Id.* ¶ 99) and plausibly alleges that Defendants either

"caus[ed]" the overseas manufacturers to falsify information or "alter[ed]" the information received from the manufacturers (*id.* ¶¶ 113-15), and passed along to Customs broker Spano information Defendants knew to be false (*Id.* ¶¶ 112, 118).

The fifth purported inconsistency is more substantial.  The FAC alleges specific misrepresentations, most of which are the converse of other alleged misrepresentations. Defendants point to the example of the FAC's allegations that Defendants misrepresented both that footwear had foxing when it did not, and that footwear did not have foxing when it did.  (*Compare id.* ¶ 119(a) *with* (b).)  That is not the only such opposing pair of misrepresentations.  As explained above, the misrepresentations alleged include both that the footwear had uppers made primarily of rubber or plastic when in fact they were made of textile materials, and that footwear had uppers made primarily of textile material when in fact they were made primarily of rubber or plastic.  (*Compare id.* ¶ 119(c) with (d).)  Another such pairing goes to the content of the footwear's sole.  (*Compare id.* ¶ 119(e) *with* (f).)  The only alleged misrepresentation that does not appear to have a corresponding "converse" allegation is the statement that footwear had flocking on their soles when in fact they did not.  (*See Id.* ¶ 119 (h) and (i).)

If the FAC alleged that both paired converse misrepresentations applied to the same similarly styled footwear, the paired statements could well be considered incompatible.  But the FAC does not make such an allegation.  Rather, it alleges that a variety of misrepresentations were made with respect to a variety of footwear.  A reasonable inference can be made that an alleged misrepresentation concerned one set of footwear, while another misrepresentation concerned a different set.  In other words, the FAC does not allege that both converse misrepresentations applied to the same styled

footwear at the same time.  To be clear, the alleged converse misrepresentations give some pause – after all, the FAC alleges that the misrepresentations were made for the purpose of reducing the Customs duties owed.  It is not apparent to the Court how a misrepresentation and its converse both would result in diminishing the corresponding Customs duties; rather, one might expect a particular misrepresentation to decrease the duties owed and the converse misrepresentation to increase the duties owed.

The FAC alleges, however, that the Defendants made the misrepresentations "either individually or in various combinations."  (FAC ¶ 119.)  Despite Defendants' assertion that certain features "invariably" increase the duties owed on footwear (Def. Mem. at ECF 15), the Court cannot conclude at this juncture that any one statement necessarily only drives the amount of duties up or down in every context or combination of representations.  And, as mentioned, at least one of the alleged misrepresentations has no alleged converse misrepresentation.  Accordingly, the Court is not persuaded by Defendants' arguments that the FAC should be dismissed because of internal inconsistencies.[4]

Defendants make much of the fact that Samsung, not any of the Defendants, was the "importer of record" of the footwear.  (Def. Mem. at ECF 11-13.)  According to Defendants, only the importer of record has certain Customs obligations and

---

[4] In their effort to demonstrate inconsistencies, Defendants also rely on assertions of fact that find no basis in the FAC or the documents on which the FAC relies.  For example, Defendants assert that "[a]s a selling agent for Samsung, Defendant Belovefine received a commission based on a percentage of sales prices, and logically would have benefitted from higher duty assessments, passed on to customers in higher prices."  (Def. Reply at 4-5 (emphases omitted).)  Defendants provide no support for that assertion, let alone support from the FAC.  While the asserted fact could prove to be true, the Court cannot accept it as such for purposes of the instant motion.

relationships.  Because Defendants were not the importer of record, they argue, they cannot be liable for false information presented in the Customs entry documents.  Not so. The False Claims Act imposes liability on a person who "knowingly makes, uses, or **causes**" a false record or statement "**to be made or used**."  31 U.S.C. § 3729(a)(1)(G) (emphasis added); *see also Tanner v. United States*, 483 U.S. 107, 129 (1987)) ("the fact that a false claim passes through the hands of a third party on its way from the claimant to the United States does not release the claimant from culpability under the Act"); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 445 (S.D.N.Y. 1999) ("The statute is violated not only by a person who makes a false statement or a false record ..., but also by one who engages in a fraudulent course of conduct that causes the government to lose money by honoring a false claim") (citing *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419, 439 (S.D.N.Y.1995)) (internal quotation marks and brackets omitted).  The FAC alleges precisely that; i.e., Defendants either acted directly or "caused others" – foreign manufacturers, Customs broker Spano, Samsung – to present false information to the Government to lower the Customs duties owed on the footwear.  (*E.g.*, FAC ¶¶ 4, 112-115, 118.)

Defendants also argue that the FAC is not well-pled because Taylor, by her own admission, "does not possess and cannot access" the Customs entry documents on which the FAC's claims are predicated.  (Def. Mem. at ECF 10 (citing FAC ¶ 124).)  As Defendants would have it, the misconduct charged in the FAC "can only be known by consulting the entry documents filed with Customs."  (*Id.*)  That argument is unavailing. First, Taylor has first-hand knowledge of many of the facts alleged as she worked for Defendants, witnessed and objected to the alleged misconduct, and, in her capacity as

relator, provided information to the Government as a result of which it obtained relief against Samsung for its participation in the scheme.  Second, the FAC describes and cites information from specific entry documents that are described and cited in the Government Complaint that "represent only a small subset" of the misclassified footwear.[5] (*See Id.*  ¶¶ 123, 124, 127.)  Third, Samsung has admitted to having acted "in conjunction with GMI" to import the footwear and provide the Customs broker with the invoices and other documents, which contained inaccurate information misrepresenting the materials and construction of the footwear and resulted in underpaid customs duties.  (Dkt. 13 at 4.)

Taylor's allegations "amply satisf[y]" the standard required to plead her claim with particularity and plausibility.  *Chorches*, 865 F.3d at 88.  The FAC's reverse false claims cause of action is sufficiently well-pled and plausible and is not subject to dismissal.

## B.    Count II:  Conspiracy

Taylor's second cause of action, also against all Defendants, charges conspiracy to commit a reverse false claim in violation of § 3729(a)(1)(C) of the False Claims Act, which imposes liability on "any person who … conspires to commit" a substantive violation of the Act.[6]   31 U.S.C. § 3729(a)(1)(C).  To sustain a reverse false claims conspiracy

---

[5] Beyond the specific examples of false Forms 7501 and Footwear Declarations cited in the FAC, Taylor's allegations create "a strong inference that [additional] specific false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 86.

[6] In their reply, Defendants assert that the False Claims Act recognizes "only conspiracies to get an affirmative false claim paid or approved by the government," suggesting, although not arguing further, that the Act does not recognize conspiracies to commit reverse false claims.  (Def. Reply at 8.)  That proposition is not correct; the False Claims Act encompasses conspiracies to commit false claims with respect to both claims for payment and claims of amounts owed.  *See* 31 U.S.C. § 3729(a)(1)(C) (imposing liability

cause of action, a plaintiff must show that "(1) the defendant conspired with one or more persons or entities to [avoid or reduce an obligation owed to] the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy." *United States v. Spectrum Painting Corp.*, No. 19-CV-2096, 2020 WL 5026815, at *15 (S.D.N.Y. Aug. 25, 2020) (quoting *United States ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C.*, 318 F. Supp.3d 680, 705 (S.D.N.Y. 2018)). "[A]n essential element of any cause of action for conspiracy, including one brought under the provisions of the False Claims Act," is an agreement or "meeting of minds" between two or more persons. *U.S. v. Incorporated Village of Island Park*, 888 F. Supp. 419, 443 (E.D.N.Y. 1995). "Because conspiracy is an inchoate crime, the plaintiff need not prove that the defendant actually achieved the object of the conspiracy and completed a substantive FCA violation (such as the presentment of a false claim)." *United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, 23 F. Supp.3d 242, 268 (S.D.N.Y. 2014).

Defendants argue that the FAC fails to state a claim for conspiracy both because it does not provide sufficient detail supporting a meeting of the minds, and because the FAC does not identify any overt act arising from or in furtherance of the conspiracy. Neither argument stands up to scrutiny. To be sure, the FAC does not allege any written agreement or specify the terms of any oral agreement. The law recognizes, however, that conspiracy agreements are not formed or entered into with the same precision and openness as lawful ones, and that nearly always an unlawful meeting of the minds can only be inferred from the parties' conduct. *See Anderson News, L.L.C. v. American*

---

for conspiracy to commit a violation of, inter alia, subsection (G), which applies to "a false record or statement material to an obligation to pay or transmit money or property to the Government").

*Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (observing that "conspiracies are rarely evidenced by explicit agreements"; rather, conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'") (quoting *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.1976)); *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (stating that "conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with ... precision").

The FAC alleges sufficient facts that make a meeting of the minds to conspire plausible, not merely possible.  The FAC alleges that Defendants "acting on their own, and in concert with others, including, but not limited to, their importer of record and certain overseas manufacturers" knowingly submitted false entry documents to Customs in order to pay lower Customs duties.  (FAC ¶ 4.)  The FAC specifically identifies at least one co-conspirator – Samsung – who admittedly "acted 'in conjunction with GMI' to misclassify GMI-imported footwear on customs entry documents in order to underpay customs duties."  (*Id.* ¶ 40 (quoting the Samsung Settlement).)  The Court agrees with GMI that "[w]hile the phrase 'in conjunction with GMI' is arguably ambiguous, in the context of other allegations in the FAC it is reasonable" to interpret the words to mean 'acting in concert with GMI to knowingly further the object of the alleged conspiracy.'"  (Pl. Mem. at 20.)  Further, the FAC identifies co-conspirators who operated in other capacities, namely the overseas manufacturers who Defendants "cause[d]" to falsify Footwear Declarations (in addition to instances in which Defendants directly altered Footwear Declarations).  (FAC ¶¶ 50-57, 115.)  Even Defendants acknowledge the alleged chain through which the Footwear Declarations passed – from manufacturer, "through Defendants' hands," to

Samsung or Samsung's agent.  (Def. Reply at 8-9.)  The FAC plausibly alleges that Defendants acted in concert with one or more of those other participants in the chain to knowingly defraud the Government.[7]  The instant case thus is materially distinguishable from the case cited by Defendants in which the complaint "alleged merely that 'Defendants knowingly conspired with each other' to violate … the False Claims Act," *United States v. HPC Healthcare*, 723 F. App'x 783, 791 (11th Cir. 2018) (quoted at Def. Mem. at ECF 19).

Defendants' cursory second argument – that the FAC does not identify "a single overt act arising from, or in furtherance of, any claimed conspiracy" – fares no better. (Def. Mem. at ECF 20.)  The FAC identifies several such overt acts, including falsification of information on Footwear Declarations and providing the false documentation to the Customs broker for submission to the Government.  (FAC ¶¶ 112-15, 118-27.)  In reply, Defendants assert that "at no point does the FAC" allege that "some document which passed through defendants' hands was presented to the government."  (Def. Reply at 9.) That is a proverbial strawman.   The FAC alleges that false Footwear Declaration information passed through Defendants' hands to Customs Agent Spano, who then used the false information to complete forms containing incorrect Customs duty amounts and "filed with Customs."  (FAC ¶ 112.)  That the specific document completed and submitted by Spano was not the same document by which Defendants supplied the false information

---

[7] Defendants also fault the FAC for not identifying "who among the Defendants made such an agreement."  (Def. Mem. at ECF 19.)  But as Taylor alleges, Maroni made all decisions for the two corporate entities, which were alter-egos of each other.  (FAC ¶¶ 31, 35.)  A reasonable inference can be made that both companies conspired with the identified co-conspirators (Samsung and manufacturers), and that Maroni specifically made the decision to do so for the companies.

to Spano is irrelevant.  *Cf. Tanner*, 483 U.S. at 129; *United States v. Bornstein*, 423 U.S. 303, 313 (1976) ("When … United dispatched each shipment of falsely marked tubes to Model, it did so knowing that Model would incorporate the tubes into the radio kits it later shipped to the Government, and that it would ask for payment from the Government on account of those tubes. Thus, United's three shipments of falsely branded tubes to Model caused Model to submit false claims to the United States, and United is thus liable"). Indeed, as explained above, liability is incurred when a person "causes" a false claim "to be made or used."  31 U.S.C. § 3729(a)(1)(G).

Taylor's conspiracy cause of action is not subject to dismissal.

## C.    Count III:  Whistleblower Retaliation

Taylor's third cause of action charges the two corporate Defendants with retaliating against Taylor, in violation of § 3730(h) of the False Claims Act, for her having raised concerns about the Defendants' misconduct.   The False Claims Act makes unlawful retaliatory action towards an employee for contesting – i.e., "blowing the whistle on" – their employer's conduct violating the Act.   31 U.S.C. § 3730(h).   To establish a whistleblower retaliation claim under the FCA, courts "have generally required a plaintiff to show that (1) [the employee plaintiff] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [the plaintiff] because he engaged in the protected activity."  *Chorches*, 865 F.3d at 95.  Adverse employment action includes constructive discharge.  *U.S. ex rel. Lee v. Northern Adult Daily Health Care Center*, 205 F. Supp.3d 276, 299 (E.D.N.Y. 2016) (holding in FCA case that "where a plaintiff alleges that he has been discharged in retaliation for engaging in protected conduct, he must plead facts to show that he was

directly terminated or that 'his employer, rather than discharging him directly, intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily'") (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003)).

The FAC alleges the requisite elements, asserting that Taylor engaged in protected conduct by raising concerns, and refusing to go along, with her employer about improper conduct with respect to misclassifying footwear and the Customs duties owed for that footwear (FAC ¶¶ 131, 140, 146); Defendants were aware of Taylor's protected activity in that both Taylor and Customs agent Spano informed GMI and Belovefine, through their common CEO Maroni, of the illegal conduct (*id*.); and both GMI and Belovefine constructively discharged Taylor in response to her whistleblowing (*id*. ¶¶ 10, 141-48).  *See Chorches*, 995 F.3d at 96-97 (holding that threat of termination due to employee's refusal to falsify a patient care report that would be used to defraud Medicare and Medicaid programs stated grounds for whistleblower retaliation under the Federal Claims Act).

Defendants do not challenge the sufficiency of Taylor's retaliation claim.  Rather, they disagree about who employed her.  Defendants devote a single short paragraph to the retaliation claim, stating that "it is undisputed that [Taylor] was never employed by GMI" but instead was employed by Belovefine.  (Def. Mem. at ECF 27.)  As a result, they argue, the claim against GMI is not well-pled.  But the FAC alleges that Taylor was in fact an employee of GMI **and** Belovefine insofar as they were alter-egos of each other.  (FAC ¶¶ 13, 31.)  Defendants provide no explanation as to why the FAC's allegation that Taylor was an employee of both GMI and Belovefine is not well-pled.  Their factual contention, which contradicts the FAC, that Taylor was not employed by GMI, provides no ground for

dismissal.  Indeed, Defendants' reply brief is silent on the point.  *See Therabody, Inc. v. Tzumi Electronics LLC*, No. 21-CV-7803, 2022 WL 17826642, at *5 (S.D.N.Y. Dec. 19, 2022) ("Tzumi's reply brief does not respond to Therabody's argument in opposition to this point, rendering it abandoned"), *R&R adopted*, 2023 WL 6387231 (S.D.N.Y. Sept. 29, 2023); *In re Hoti Enterprises, L.P.,* Nos. 10-24129, 13-CV-3638, 2014 WL 1244779, at *4 (S.D.N.Y. Mar. 26, 2014) ("Dedvukaj does not address GECMC's response in his reply and is therefore deemed to have abandoned this argument") (collecting cases), *aff'd*, 605 F. App'x 67 (2d Cir. 2015).

Taylor's whistleblower retaliation claim should not be dismissed.

## D.   Claims Against Defendant Maroni

Defendants argue that even if claims are stated against the two corporate defendants, the FAC fails to state a claim against Defendant Maroni.  They describe the FAC as alleging only that Maroni is the CEO who exercised control over both companies, and that Maroni merely threw a pen and stapler at her.  (Def. Mem. at ECF 25.)  From that, Defendants assert that Maroni cannot be held liable for violation of Customs laws "merely because he or she is the owner or officer of a corporate importer.  (*Id.* at ECF 26 (citing *United States v. Tip Top Pants, Inc.*, 34 C.I.T. 17 (2010).)

Defendants' characterization of the FAC, however, overlooks the full extent of the allegations made against Maroni.  The FAC goes well beyond merely noting that Maroni is an owner or officer of GMI and Belovefine.  It alleges that Maroni "exercised conclusive, complete and unfettered control" over both companies and "all of their business activities." (FAC ¶ 35.)  And, it alleges specific personal actions taken by Maroni in furtherance of defrauding Customs, including instructing GMI's COO to coerce Taylor to falsify a

Footwear Declaration (*id.* ¶ 131), threatening Taylor that she would lose her job "if she did not participate in Defendants' scheme to defraud Customs" (*id.* ¶ 145), and trying to force Taylor to train another employee "to do the illegal acts she refused to perform" (*id.* ¶ 147).  Such facts materially distinguish the instant case from *Tip Top Pants* and are consistent with *United States v. Trek Leather Inc.*, 767 F.3d 1388 (Fed. Cir. 2014), which Defendants cite for the proposition that, to be held liable under the Customs laws,  an owner or officer of a corporate defendant must have personally committed an act or omission causing the introduction or entry of goods into the United States by false means.

Finally, as with its scant argument regarding Taylor's whistleblower retaliation claim, Defendants' reply brief makes no further effort to defend their argument about Maroni's personal involvement.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is denied in its entirety. Taylor is entitled to proceed to attempt to prove her claims.  Whether she will be able to do so, however, remains to be seen.  To the extent not discussed above, the Court has considered Defendants' arguments and determined them to be without merit.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: January 26, 2024

Copies transmitted to all counsel of record.

27