UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA *ex rel.*, :
DEVYN TAYLOR,                                      :                16-CV-7216 (RWL)
                                                              :
                              Plaintiff,              :
                                                              :             **DECISION AND ORDER:**
          - against -                                :             **MOTION FOR PARTIAL**
                                                              :             **SUMMARY JUDGMENT**
GMI USA CORP., BELOVEFINE, LTD., and :
STEFANO MARONI,                            :
                                                              :
                              Defendants.         :
-----------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff-Relator Devyn Taylor ("Taylor" or "Plaintiff") filed this action against

Defendants GMI USA Corp. ("GMI"), Belovefine, Ltd. ("Belovefine"), and Stefano Maroni

("Maroni"), under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., to recover

damages and civil penalties on behalf of the United States and herself.  Taylor alleges

that the Defendants conspired to and did engage in a scheme to misrepresent the tariff

classifications and corresponding United States Customs ("Customs") duties owed to the

government for footwear imported into the United States.  Taylor also alleges that GMI

and Belovefine constructively discharged her in retaliation for objecting to Defendants'

illegal practices.  The United States is no longer a party to the case.  GMI and Belovefine

have defaulted, leaving Maroni as the only active Defendant.  Taylor has moved for partial

summary judgment against Maroni to narrow the issues for trial.  For the following

reasons, Taylor's motion is GRANTED in part and DENIED in part.

**BACKGROUND**[1]

As required on a motion for summary judgment, the Court reviews the record in the light most favorable to Maroni as the non-moving party and draws all reasonable inferences in his favor. *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000). Unless otherwise noted, the facts are undisputed. Before laying out the facts, however, the Court first addresses shortcomings in the parties' statements of undisputed facts submitted pursuant to Local Rule 56.1 for the Southern District of New York.

**A.    The Parties' Statements Of Undisputed Material Fact**

**1.    Taylor's Assertion Of Facts**

Taylor has set forth 249 statements of undisputed material facts. While many of her assertions cite supporting evidence in the record, some of them fail to cite any support, or they cite evidence that does not support the proposition stated. (*See, e.g.*, Taylor 56.1 ¶¶ 188, 207(w), 218, 233, 234.) In those instances, the Court does not credit

---

[1] The facts are drawn from parties' statements of undisputed material fact and responses thereto as well as the submitted declarations and affidavits, which include: Plaintiff's Statement of Material Facts in Support of Her Motion for Partial Summary Judgment Under F.R.C.P. 56(a) (Dkt. 102) ("**Taylor 56.1**"); Attorney Affirmation in Support of Plaintiff's Motion for Partial Summary Judgment Under F.R.C.P. 56(a) (Dkt. 103) ("**McInnis Aff.**"); McInnis Exhibits 1 through 13 and McInnis Exhibits A through PP (identified in and attached to various McInnis affirmations at Dkts. 103, 106, 110-14) (referenced herein as "**McInnis Ex. __.**"); Plaintiff's Declaration in Support of Plaintiff's Motion for Partial Summary Judgment Under F.R.C.P. 56(a) (Dkt. 103-1) ("**Taylor Decl.**"); Declaration of Wayne Bailey dated 12/7/2023 (Dkt. 103-2) ("**Wayne Decl.**"); Supplemental Declaration of Wayne Bailey dated 3/8/2024 (Dkt. 103-3) ("**Supp. Wayne Decl.**"); Declaration of Grace Greenstein dated 1/10/2024 (Dkt. 103-4) ("**Greenstein Decl.**"); Declaration of Arielle Jimenez dated 12/12/23 (Dkt. 103-5) ("**Jimenez Decl.**"); Declaration of Nadia Sotomayor dated 11/30/2023 (Dkt. 103-6) ("**Sotomayor Decl.**"); Declaration of Evelyn Maletich dated 1/6/2024 (Dkt. 103-7) ("**Maletich Decl.**"); Declaration of Bono Choi dated 1/19/2024 (Dkt. 103-8) ("**Choi Decl.**"); Declaration of Bono Choi dated 3/8/2024 (Dkt. 103-9) ("**Supp. Choi Decl.**"); Declaration of Francesca Mallinson dated 2/12/2024 (Dkt. 103-10) ("**Mallinson Decl.**"); and all attached exhibits.

the assertion unless the Court's own review of the record identifies support.  *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent … must be followed by citation to evidence that would be admissible"); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) (stating that a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record," and that "[w]here ... the record does not support the assertions in a Local Rule 56.1 statement, those assertions [are] disregarded and the record reviewed independently").

### 2.    Maroni's Opposition

Whereas Taylor has submitted a Rule 56.1 statement that is mostly compliant, Maroni has not submitted any counter-statement of disputed and undisputed facts as required by Local Rule 56.1(b) and (c).  Maroni, proceeding *pro se* at this juncture, was on notice of the requirement to include the Rule 56.1 statement in his opposition.  (*See* Dkt. 100.)  As he failed to do so, the asserted facts in Taylor's statement of undisputed material facts, if supported by the record, may be deemed admitted.  *See Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998) ("We accept as true the material facts contained in defendants' … statement [of undisputed material facts] because plaintiff failed to file a response"); *Conti v. Zamilus*, No. 16-CV-7741, 2018 WL 6181363, at *1 n.2 (S.D.N.Y. Nov. 26, 2018) ("Because [*pro se*] plaintiff has not submitted a statement of facts pursuant to Local Civil Rule 56.1, the material facts set forth in defendants' Local Rule 56.1 statement, when supported by the summary judgment record, are deemed admitted for purposes of this motion"); *Bellantoni v. General Motors Corp.*, No. 08-CV-2407, 2012 WL 1948779, at *1 n.2 (S.D.N.Y. May 3, 2012) (deeming all facts in defendant's Rule 56.1 statement as true where plaintiffs did not submit a Rule 56.1

3

statement of material facts) *R. & R. adopted*, 2012 WL 1948868 (S.D.N.Y. May 30, 2012); *Arline v. Potter*, 404 F. Supp.2d 521, 527 (S.D.N.Y. 2005) (deeming all facts in defendant's Rule 56.1 statement as true where plaintiff only submitted memorandum of law in opposition to a summary judgment motion without a statements of material facts).

There is an additional problem with Maroni's submission. His opposition includes 10 exhibits that Taylor argues should have been disclosed during discovery but were not. (Taylor Reply at 7-9; *see also* Maroni Opp. at ECF 15-31.) Maroni has not disputed that assertion or provided any explanation for not having previously produced the documents. Accordingly, the Court may not consider any of the undisclosed exhibits as summary judgment evidence. *See John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp.2d 262, 269 n.4 (S.D.N.Y. 2014) (on motion for summary judgment, court may not consider document not produced during discovery), *aff'd*, 882 F.3d 394 (2d Cir. 2018); *see also* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"). Even if the Court were to consider the documents attached to Maroni's opposition, the majority go to disproving Maroni's knowledge and involvement in the alleged scheme. As discussed below, that issue is not implicated by the instant motion. The exhibits therefore are in large part immaterial to the motion.

### 3.    The Court's Review Of The Record

Just because a fact has been asserted or deemed admitted does not mean that it is material. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990) ("summary judgment cannot be avoided by immaterial factual disputes"). In some instances, the

Court addresses immaterial facts in footnotes for context and completeness, but there are also immaterial facts that the Court does not discuss. Similarly, the Court does not reference every assertion of fact for which it has determined that the support cited is inadmissible or does not establish the assertion made. The Court has, however, conducted its own searching review of the summary judgment record. *See Holtz*, 258 F.3d at 73 (recognizing court's broad discretion to conduct an assiduous review of the summary judgment record and in considering the consequences of a party's failure to comply with local rules, including specifically S.D.N.Y Local Rule 56.1).

**B.    The Parties And Non-Parties**

GMI and Belovefine are privately owned New York companies that design, source, and sell footwear in the United States under various brand names. (*See* Jimenez Decl. ¶ 4; *see also* Sotomayor Decl. ¶ 5; Choi Decl. ¶ 10; McInnis Ex. F at ECF 2.)  The footwear at issue was manufactured in foreign factories, imported into the United States, and subsequently sold to companies like Nordstrom, Saks Fifth Avenue, and DSW. (Taylor 56.1 ¶ 33; McInnis Ex. I (Response of Defendants to Plaintiff's Second Request for Admissions ("Second RFA")) ¶ 32; McInnis Ex. D (Transcript of Deposition of Stefano Maroni dated 3/6/2024 ("Maroni Dep.")) 18:6-10.) Maroni owns, operates, and is the Chief Executive Officer of both GMI and Belovefine. (*See* Dkt. 18 ¶ 34; Dkt. 67 ("Answer") ¶ 34; McInnis Ex. E (Response of Defendant Stefano Maroni to Plaintiff's First Request for Admissions ("First RFA")) ¶¶ 1-4.)  Taylor was employed by GMI and Belovefine as a

Production Manager from January 25, 2016, to August 23, 2016. (Taylor 56.1 ¶ 9; Taylor Decl. ¶¶ 10-16.)

Samsung C&T America, Inc. ("Samsung") is the "importer of record" of the footwear at issue. (Supp. Choi Decl. ¶¶ 1, 6; Taylor 56.1 ¶ 42; McInnis Ex. F.) A Sales Representative Agreement ("SCTA Agreement") governed the relationship between Samsung, GMI, and Belovefine and outlined Samsung's responsibilities as importer of record. (Taylor 56.1 ¶ 29; McInnis Ex. F.) Samsung either purchased the footwear directly from the manufacturer, or financed GMI's purchase of the footwear. (Taylor 56.1 ¶ 171; Supp. Choi Decl. ¶ 10.) Samsung also warehoused the footwear. (McInnis Ex. F at ECF 1.) Michael R. Spano & Co. Inc. ("Spano") was the customs broker for purposes of clearing merchandise imported into the United States. (Taylor 56.1 ¶ 54; Supp. Choi Decl. ¶ 7.) Spano prepared and submitted the required entry documents and calculated the customs duties owed. (Taylor 56.1 ¶ 56.) Worldwide Logistics Ltd. ("Worldwide") acted as freight forwarder and logistics provider of the imported footwear. (*Id.* ¶ 55.)

## C.    Customs Duties And Forms

The principal document used to enter merchandise into the United States is the Customs Entry Summary, also designated as Form 7501. (Mallinson Decl. ¶¶ 23-24.) Form 7501 requires the importer of record to accurately describe the merchandise, list the corresponding duty rate, and calculate the correct amount of duties and excise taxes owed. (*Id.* ¶¶ 24, 26.) The applicable duty rates are listed in the Harmonized Tariff Schedule of the United States ("HTS"). (*Id.* ¶ 26.)

The HTS codes are made up of 10-digit sequences. (*See id.* Ex. D2 at ECF 21 (Form 7501 dated 8/15/2016 listing HTS code as "6402.99.3145.") The first two digits of

the HTS code refer to the HTS Chapter for footwear – "64." (Mallinson Decl. ¶ 26.) The next two digits refer to the footwear's upper-part textile material. For instance, "02" indicates an upper part made out of rubber or plastic, while "04" indicates a textile upper part. (*Id.*) The fifth and sixth digits refer to the length of the footwear, for example whether it is below the ankle ("99") or above the ankle and below the knee ("91"). (*Id.*) The final four digits refer to footwear within "other" categories designated by Customs under the article description of the footwear.[2] (*Id.*) Typically, a customs broker prepares and files a Form 7501 with Customs on behalf of the importer of record. (*Id.* ¶ 23.)

In addition to Form 7501, importers of record are required to submit an invoice accompanying the goods that accurately describes the merchandise. (Taylor 56.1 ¶ 21; FAC ¶¶ 90-93; Answer ¶¶ 90-93.) Customs regulations require that the invoice for footwear be accompanied by supplemental information when the invoice itself does not contain all of the details necessary to appropriately classify the merchandise. (Taylor 56.1 ¶ 22 (citing 19 C.F.R. § 141.89); Mallinson Decl. ¶ 28.) The supplemental information for footwear is provided in a document called an International Footwear Association Footwear Retailers of America Interim Footwear Invoice, known also as an "IFI" or "Footwear Declaration." (Taylor 56.1 ¶ 22; Mallinson Decl. ¶ 28.) The Footwear Declaration requires identification of several features: the materials comprising the footwear's "upper" and external surface of the sole; whether the height of the upper covers

---

[2] Nothing in the record identifies examples of the "other" categories designated by Customs in the HTS. That information, however, can be found on the website of the United States Internation Trade Commission. Some examples of "other" categories for which the last four digits of the HTS code would be relevant include: work footwear for men or women; "[t]ennis shoes, basketball shoes, gym shoes, training shoes and the like"; and shoes "[m]ade on a base or platform of cork." *See Harmonized Tariff Schedule*, United States International Trade Commission, https://hts.usitc.gov (last visited March 6, 2025).

the knee or ankle; whether the footwear has "foxing" applied or molded at the sole and overlapping the upper, and, if so whether the foxing is made wholly or almost wholly of rubber or plastics; and whether the footwear possesses certain other characteristics. (Taylor 56.1 ¶ 22; Mallinson Decl. ¶¶ 29-32.) The foreign manufacturer typically prepares the Footwear Declaration and sends it to the importer of record, who provides it to the customs broker to determine the proper HTS codes and duty rates. (Taylor 56.1 ¶ 22.) Customs brokers "must make an independent classification determination based upon the facts provided in the commercial invoice and IFI." (Mallinson Decl. ¶ 31.) If faced with an uncertainty relating to the HTS code, customs brokers may consult with footwear industry experts. (*Id.* ¶ 39.)

For footwear, the duty rates can vary substantially depending on the nature of the footwear's material, type, construction, and characteristics. (Taylor Decl. ¶ 43.) For example, a shoe with an upper composed mostly of textile may be assessed a duty of 9% of the value of the shoe, whereas a shoe with an upper composed mostly of rubber/plastics may be assessed a duty of 20% of the value of the shoe plus $0.90 per pair of shoes. (Taylor 56.1 ¶ 109; Taylor Decl. ¶ 88; Mallinson Decl. ¶ 26.)

The scheme alleged here implicates in particular footwear constructed with "foxing" and "flocking," and uppers made with textile or polyurethane ("PU"). Foxing is "a strip of material, separate from the sole and upper, that secures the joint where the upper and sole meet." (Taylor Decl. ¶ 48 n.2.) Flocking refers to "the process of depositing or spraying small fiber particles (called flock) onto the footwear's surface to create a stylish faux leather fabric and appearance." (*Id.* ¶ 48 n.3.) "Textile" uppers are composed of "woven fabrics," whereas PU uppers are comprised of "rubber, plastic and other man-

made materials." (*Id.* ¶ 49 nn. 4, 5.) As demonstrated by the following chart, the tariff classifications and duty rates applicable to the footwear at issue during the relevant time period were determined by various combinations of those footwear characteristics:

| Upper | Foxing | Flocking | Price of Shoe | Duty Rate |
|-------|--------|----------|---------------|-----------|
| PU | Foxing | No Flocking | $6.50-$12.00 | 20% plus $.90/pair |
| PU | Foxing | No Flocking | > $12.00 | 20% |
| PU | No Foxing | Regardless | - | 6% |
| Textile | Regardless | No Flocking | - | 37.5% |
| Textile/PU | Regardless | Fabric Flocking | - | 12.5% |

(*See* Maletich Decl. Ex. 1 (HTS Code Cheat Sheet).)

**D.    GMI and Belovefine Merchandise At Issue**

Taylor identifies 14 or so styles of GMI and Belovefine footwear with textile uppers that did not have flocking and, according to Taylor, would have been subject to a duty rate of 37.5%.[3] She identifies more than 20 styles of footwear with PU uppers that had foxing or a foxing-like band and, according to her, would have been subject to a duty rate

---

[3] The shoe styles Taylor identifies as not having flocking are: Jenson Lace-BN7S00043; Prill Lace-BN7S00143; Pete Slip On-BN6F00107, BN7S00146; Jenson Slip On-BN7S00042; Prill Slip On-BN7S00141; Ron-BN7S00047; Rhett-BN7S00147; Stevie-BN7S00049, BN6F00005; Steven-BN6F00105, BN7S00149; James Sneaker-BN7S00045; Jayme Sneaker-BN7S00145; and Ben Sherman Espadrille shoes. (*See* Taylor Decl. ¶¶ 79-82(a-k); Jimenez Decl. ¶¶ 12-13 (noting Ben Sherman Espadrilles were constructed without flocking warranting a higher duty rate).) The factory that manufactured the Ben Sherman shoes was not capable of manufacturing shoes with flocking for lack of necessary machinery and materials. (Taylor 56.1 ¶ 102; Taylor Decl. ¶ 81.)

of 20% plus $0.90 per pair.[4]  She identifies one pair of shoes that had a PU upper and, accounting for the price of the shoe, accordingly would have been subject to a duty rate of 20%.[5]

Maroni submitted documents in opposition to the instant motion purporting to show that certain shoes sold by GMI and Belovefine were evaluated by a third party and found to have no foxing or foxing-like bands and thus would support only a 6% duty rate.  (*See* Maroni Opp., Ex. 4 (evaluation report of Presley Gingham Slip On, style BNMS19009); Ex. 8 (email from Greenstein stating "Parnell/Presley Oxford passed for NO foxing").)  As noted above, however, the Court may not consider those documents as they were not produced during discovery.  And, even if the documents were admissible, they do not help Maroni.  The documents show only that two specific styles of men's footwear did not

---

[4] The shoe styles Taylor  identifies as having foxing are:  Vaughn-BN6F00088, BN7S00063; Vance-BN7S00163, BN6F0018; Victor-BN7S00064, BN6F00013; Vince-BN7S00164,     BN6F00013;     Knox-BN6F00011,     BN7S00060;     Lox-BN6F00111, BN7S00160; Presley Oxford-BN7S00057, BN6F00082; Oxford Parnell BNM00009; Parnell-BN6F00182, BN7S00157 and Parnell Oxford; Presley Cap Toe-BN6F00084, BN7S00058; Preston-BN6F00083, BN7S00061; and Payton-BN6F00183, BN7S00161. (Taylor Decl. ¶¶ 76(a-k); *see also* McInnis Ex. 11 (classifying Ben Sherman Knox shoe as one with foxing and requiring a 20% duty); McInnis Ex. 12 (classifying Vaughn/Vance shoe as one with foxing-like bands requiring a 20% duty); McInnis Ex. 13 (classifying Preston/BN7S00061 shoe as one with a foxing-like band requiring 20% duty); McInnis Ex. S (classifying Oxford Parnell Men's Shoe Style BNM00009 as a shoe with a foxing-like band requiring a 20% duty).)

As proof of the correct duty rate for certain shoe styles, Taylor submitted "line sheets" that were maintained at the office and used to determine the duty rate for specific styles of shoes.  (*See* McInnis Exs. X, Y.)  The line sheets contain HTS codes in red type corresponding to the footwear listed.  However, underneath the HTS codes, the phrase "should be 20% + .90" appears in blue type.  It is unclear how, when, why, or by whom the blue text originated in the line sheets.  Accordingly, for purposes of the instant motion, the Court does not consider the blue text on the line sheets as established fact.  The Court will, however, consider the material of the shoes indicated on the line sheets as there is no dispute about that information.  (*See generally* First RFA.)

[5] The shoe style Taylor identifies as having a PU upper is BN6F00018.

have foxing; but, Taylor does not identify those two styles as ones for which GMI and Belovefine employees falsified information.  (*See* Taylor Decl. ¶¶ 76(a-k), 79-82(a-k) (lists of footwear styles Taylor observed were falsified to obtain lower duty rates).)

## E.    The Scheme

Samsung, as the importer of record, relied on GMI and Belovefine, as the footwear's designers, to enter production and shipping information ("Product Data") for each footwear style into an Order Management System ("OMS").  (Supp. Choi Decl. ¶ 10.) For each style, the Product Data included the footwear's physical characteristics and applicable HTS code.  (*Id.*)  When fulfilling GMI's and Belovefine's purchase order requests, Samsung relied on the Product Data from the OMS to send the relevant footwear style and HTS code to the foreign manufacturer.  (*Id.*)  Using the Product Data provided by Samsung, the foreign manufacturer created additional shipping documentation and summaries (the "Import Documentation") that it emailed to Samsung once the footwear was manufactured.  (*Id.*)

Samsung or Worldwide then sent Spano, as the customs broker, the Import Documentation associated with the imported footwear.  (Mallinson Decl. ¶ 41.)  Spano used the Import Documentation to prepare and file with Customs various documents for the imported merchandise.  (*Id.* ¶¶ 22, 41.)  Specifically, Spano prepared and submitted Forms 7501, along with commercial invoices and Footwear Declarations (collectively, the "Customs Forms").  (*Id.* ¶¶ 22, 23, 36 and Ex. D2.)  From time to time, Spano employees communicated with GMI and Belovefine employees when preparing the Customs Forms, particularly if Spano identified a discrepancy between the HTS codes and the physical characteristics identified on the Import Documentation for the footwear being imported.

(Mallinson Decl. ¶ 18; Supp. Choi Decl. ¶ 10; *see e.g.* McInnis Exs. J, O.)  On such occasions, GMI or Belovefine provided clarifying or missing information in the form of revised commercial invoices and Footwear Declarations, or within email communications (the "Revised Documentation").  (*See* Mallinson Decl. ¶ 48; *see e.g.* Ex. O.)

Several GMI and Belovefine employees aver that for a period of years ending in or about 2019,[6] they supplied false duty information to Spano when Spano inquired about discrepancies.[7]  (Taylor 56.1 ¶¶ 73-74.)  According to Taylor, in her role as Production Manager at GMI and subsequently Belovefine, and at Maroni's instruction, she "whited out" information in Footwear Declarations that were prepared by the shoes' manufacturer and entered in its place false duty-related information prior to transmitting the Revised Documentation to Spano.[8]  (Taylor 56.1 ¶¶ 105-106; Taylor Decl. ¶¶ 84-85.)  Chief Operating Officer ("COO") Wayne Bailey observed GMI and Belovefine employees falsifying data on Footwear Declarations to obtain lower duty rates, and participated directly in the scheme by sending emails to Spano requesting an incorrect HTS code be used to obtain a lower duty.  (Taylor 56.1 ¶¶ 114, 116; Bailey Decl. ¶¶ 16-19; McInnis Ex. R (Bailey stating, "Please make the entry with 6402 99 3145").)  Arielle Jimenez, former

---

[6] Bailey attests that the scheme continued through at least 2018.  (Bailey Decl. ¶ 20; *see also* Maletich Decl. ¶ 18 ("At the start of my second round of employment with GMI [in November 2019]" Maroni noted "that allegedly wrong duty rates were used in the past by predecessors").)

[7] Whether providing false information to Spano occurred with Maroni's knowledge is in dispute.  While several employees attest to having falsified information at Maroni's direction, Maroni denies that he did so.  (Third RFA ¶¶ 11, 14.)  The dispute is immaterial, however, as it is not at issue on the instant motion.  (*See* Taylor Reply at 1-2.)

[8]  Taylor also falsely advised a foreign manufacturer that a shoe had textile uppers, when, in fact, they were polyurethane.  (Taylor 56.1 ¶ 108; Taylor Decl. ¶ 87; McInnis Ex. P (Taylor asking manufacturer to "please revise the IFI to reflect Majority textile not PU").)

GMI and Belovefine Production and Logistics Manager, attests that based on Maroni's instruction, she had "no choice but to change the IFIs" for the Ben Sherman espadrilles the company imported to "make it look like they had flocking on the outer soles" to get the lower duty rate.  (Jimenez Decl. ¶¶ 11, 13.)  Similarly, Nadia Sotomayor, former GMI and Belovefine Assistant Production Manager, was instructed by Bailey to "amend" Footwear Declarations for Ben Sherman shoes by changing the Footwear Declaration to reduce the duty rates.  (Taylor 56.1 ¶¶ 121-22; Sotomayor Decl. ¶¶ 17-20.)  Sotomayor heard Bailey tell other employees that the Footwear Declarations needed to be adjusted because Maroni "[was] not happy with this price point after duties and tariffs."  (Taylor 56.1 ¶ 124; Sotomayor Decl. ¶¶ 21-23.)   Another employee, Grace Greenstein, former GMI and Belovefine Senior Production Manager, reviewed margins with Maroni, who informed her that the company does not pay more than 6% duty rates.  (Greenstein Decl. ¶ 12.)

Around 2016, Spano noticed a significant number of instances where Spano would receive incomplete information in the Import Documentation from the foreign manufacturers, and the Revised Documentation that Belovefine and GMI sent to resolve the discrepancies contained internally conflicting information.  (Mallinson Decl. ¶¶ 48-49; see, e.g., McInnis Ex. O at ECF 7 (Spano employee Bernadette Arroyo emailing GMI employees, "I have another shipment with discrepancies between the Invoice HTS number and the IFI's").)  Typically, the Import Documentation provided from the foreign manufacturers contained HTS codes warranting a higher duty rate due to the physical characteristics of the footwear.  (Mallinson Decl. ¶ 46.)  After asking GMI and Belovefine to provide clarification, GMI and Belovefine produced Revised Documentation with

amended Product Data prompting Spano to classify the footwear at a lower duty rate. (*See, e.g.*, McInnis Ex. O.)

The discrepancies noted by Spano commonly concerned whether or not shoes had foxing and flocking. (Mallinson Decl. ¶¶ 50-52.) For men's shoes that had foxing or foxing-like bands on the outsole, GMI and Belovefine employees provided Revised Documentation requiring Spano to revise the HTS codes to reflect men's shoes that did not have a foxing bands or foxing-like bands. Such an adjustment lowered the duty rate from 20% plus $0.90 per pair, to 6%. (Taylor 56.1 ¶¶ 83-84; Mallinson Decl. ¶¶ 50-51; *see, e.g.*, McInnis Ex. J (GMI employee Fernandez informing Spano, "I just finished getting in contact with the factory. As per the factory and revised IFI the knox does not have a foxing"); McInnis Ex. O at ECF 4 (GMI employee Fernandez informing Spano, "We just pulled the sample and realized it [sic] a cup-sole and does not have foxing").) Similarly, GMI and Belovefine employees provided Revised Documentation to Spano requiring it to revise HTS codes to reflect men's shoes with textile uppers that had micro-fiber textile flocking on the bottom of the outsole, when the shoes in fact were not flocked. (Mallinson Decl. ¶ 52.) Shoes that were not flocked received a 37.5% duty rate, while those that were flocked received a 12.5% rate. (*Id.*)

For example, when Spano prepared a Form 7501 for Style BX6HWIFC135-BN6F00188, the Import Documentation provided to Spano identified the HTS code as 6402.99.8031 (indicating footwear with a foxing band or foxing-like band, having a duty of $0.90 per pair + 20%), and Spano filed a Form 7501 with that HTS code and its corresponding 20% duty. (*See* Mallinson Decl. ¶ 47 and Ex. D1 (Form 7501 dated 8/5/2016).) GMI later provided to Spano Revised Documentation representing that that

footwear "in fact did not have a foxing band or foxing-like band." (Mallinson Decl. ¶ 47.) Based on this representation, Spano issued a revised Form 7501 with an HTS code of 6402.99.3145 (for footwear that does not have a foxing band or foxing-like band) and a corresponding lower duty rate of 6%.[9] (Mallinson Decl. ¶ 47 and Ex. D2 at ECF 21.)

In February 2017, a Spano employee expressed concern to Maroni and Bailey regarding the frequency with which Spano had to amend the Import Documentation it initially received. (*See* Mallinson Decl. ¶ 54 and Ex. K (email from Spano employee Francesca Ris to Wayne Bailey dated 2/21/2017).) GMI and Belovefine then discharged Spano as customs broker and used Worldwide in its place.[10] (Mallinson Decl. ¶ 54; McInnis Ex. K at ECF 9; Supp. Bailey Decl. ¶¶ 1-3.)

## F.    Retaliation

During her employment in 2016, Taylor learned that GMI and Belovefine were underreporting duty liabilities for footwear on Customs entry documents to unlawfully increase profit margins. (Taylor Decl. ¶¶ 45-46.) Taylor asserts that after she discovered the scheme, she informed Maroni on multiple occasions that she was "not comfortable going along with [the scheme]." (*Id.* ¶¶ 55-56.) According to Taylor, once Maroni saw that she "was not going to be a 'yes person' in his Customs fraud scheme," Maroni "made

---

[9] As discussed below, Taylor does not identify this particular shoe style as one of the styles implicated in the scheme. Even though the Form 7501 for that particular style was revised, the record does not reveal whether the revised information was false.

[10] Bailey was the employee who terminated Spano as customs broker. He asserts that he acted at Maroni's direction. (*See* Supp. Bailey Decl. ¶¶ 2-3.) Maroni denies giving the instruction to terminate Spano. (*See* Maroni Dep. 162:19-163:23.) Taylor argues that this is "not plausible" due to the sequence of events surrounding Spano's termination. (Taylor 56.1 ¶ 90.) In any event, whether Maroni instructed Bailey to terminate Spano goes to the issue of Maroni's knowledge and involvement, which is not at issue on the present motion.

the conditions at [her] job unbearable and intolerable."  (*Id.* ¶ 60.)  Maroni became

enraged and threatening toward Taylor, throwing a stapler at her head (although missing

hitting her); throwing a pen at her (which did hit her) on another occasion; and yelling at

Taylor so that other employees could overhear his screams, leaving her "shaking and in

tears."  (*Id.* ¶¶ 58-59.)    Maroni also threatened to terminate Taylor's employment,

knowing she "had a young family that desperately needed [her] income."  (Taylor Decl.

¶ 58.)  Taylor was subsequently informed that she was to be terminated but needed to

train her replacement before she was let go.  (*Id.* ¶ 61.)  As a result, Taylor felt "compelled"

to quit her job on August 21, 2016.  (*Id.* ¶ 62.)  Taylor then was unemployed for a

substantial period and experienced considerable emotional and psychological distress.

(*Id.* ¶ 64.)  Maroni denies throwing anything or screaming at Taylor or retaliating against

her in any way.  (Maroni Dep. 84:4-85:11.)

## PROCEDURAL HISTORY

Taylor commenced this *qui tam* action as a relator on September 15, 2016.  (Dkt.

12.)  Taylor's initial complaint named only GMI as a defendant, although non-party

Samsung was the footwear's importer of record.  On February 3, 2023, the United States

filed a complaint in partial intervention naming Samsung as the only defendant (the

"Government Complaint").  (Dkt. 14.)  The Government then entered into a settlement

agreement with Samsung pursuant to which Samsung agreed to pay $1,000,000 in

restitution and penalties under the False Claims Act (the "Samsung Settlement") (Dkt.

13.)  As the relator, Taylor received $210,000 of the Samsung Settlement amount.  (Dkt.

16.)  The Samsung Settlement expressly did not release GMI or any affiliate from any

claims that may be asserted by Taylor relating to the misclassification conduct.  (Dkt. 25 ¶ 1.)

On March 6, 2023, Taylor filed a First Amended Complaint ("FAC"), dropping Samsung as a defendant and adding Belovefine and Maroni as defendants along with GMI.  (Dkt. 18.)  The Defendants moved to dismiss the FAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkts. 52-54.)  On January 26, 2024, the Court denied the motion.  *See United States ex rel. Taylor v. GMI USA Corp.*, 714 F. Supp.3d 275 (S.D.N.Y. 2024).  In doing so, the Court found that Taylor had adequately pled (1) a reverse FCA claim in violation of 31 U.S.C. § 3729(a)(1)(G); (2) conspiracy to commit reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(C); and (3) whistleblower retaliation in violation of 31 U.S.C. § 3730(h) against all Defendants.  *Id.* at 294.  Defendants filed their Answer on February 15, 2024.  (Dkt. 67.)

Following the close of discovery, Defendants' counsel moved to withdraw as their attorney.  (Dkt. 71.)  The Court granted the motion and stayed the case for 30 days to allow Defendants an opportunity to retain new counsel.  (Dkt. 75.)  No new counsel appeared on behalf of any of the Defendants.  Maroni thus was deemed to be proceeding *pro se*; and, as corporate entities that could only appear through counsel, GMI and Belovefine were deemed in default by the Clerk of Court.  (Dkt. 94.)

Taylor filed the instant motion for partial summary judgment against Maroni on August 21, 2024.  (Dkts. 98-103.)  Maroni filed his opposing brief on October 3, 2024. (Dkt. 104.)  Taylor filed a reply and accompanying affidavit on October 21, 2024.  (Dkts. 105-06.)  On January 22, 2025, at the Court's direction, Taylor filed supplemental affidavits annexing documents that had been referenced in her Statement of Facts but

had not previously been filed.[11]  (Dkts. 110-113.)  The motion is now fully briefed and ripe for determination.

## STANDARD OF REVIEW

To obtain summary judgment under Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a). The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party."  *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986) (similar).  Conversely, "[s]ummary judgment is improper 'if the evidence is such that a reasonable jury could return a verdict for a nonmoving party.'"  *Banks v. General Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).  The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

---

[11] The Court uses the following conventions to refer to the parties' briefs. Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment Under F.R.C.P. 56(a) (Dkt. 101) ("**Taylor Mem.**"); Defendant's Response to Plaintiff's Motion for Summary Judgment (Dkt. 104) ("**Maroni Opp.**"); and Plaintiff's Reply Memorandum of Law in Further Support of Motion for Partial Summary Judgment Under Fed. R. Civ. P. 56(a) (Dkt. 105) ("**Taylor Reply**").

The opposing party then must come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment.  *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order).  Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted.  *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

In assessing the record to determine whether there is a genuine issue of material fact, the Court must "eschew credibility assessments," *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal quotation marks and citation omitted), and resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

## DISCUSSION

Taylor argues that partial summary judgment is warranted in three respects.[12]  She contends that the only disputed issue for trial against Maroni on the reverse FCA claim is whether Maroni had "knowledge of, and [a] personal role in, the alleged Customs duty

---

[12] While Taylor purports to move for partial summary judgment because "many of the essential elements for the ***claims*** in this action are not genuinely in dispute" (Taylor Mem. at 1 (emphasis added)), Taylor acknowledges that her motion "does not address the conspiracy claim" (*id*. at 5 n.6).  Accordingly, the instant decision and order does not reference the conspiracy claim further.

fraud scheme." (Taylor Mem. at 13.) Put another way, Taylor contends that all but one of the essential elements of a reverse FCA claim are not in dispute, including obligation to the government, false record or statement, causation, and materiality. Second, Taylor argues that GMI and Belovefine indisputably are each other's alter ego and thus jointly and severally liable for all claims. Third, she seeks summary judgment that Maroni is individually liable as to all claims because he is the alter ego of GMI and Belovefine and was Taylor's employer-in-fact. As will be discussed, the Court finds that Taylor is entitled to partial summary judgment on some of the reverse FCA claim elements she asserts are not subject to genuine dispute, but she is not entitled to summary judgment on the remainder of her motion.

## I.     Reverse FCA Claim

The Court first resolves the issue of whether Taylor is entitled to summary judgment to the extent that "[n]one of the essential elements for the alleged violation of 31 U.S.C. § 3729(a)(1)(G) is in dispute save Maroni's alleged knowledge of, and personal role in, the alleged Customs duty fraud scheme." (Taylor Mem. at 13.)

The False Claims Act imposes liability under the "reverse" claim section when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money ... to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money ... to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) ("Subsection (a)(1)(G) is referred to as the reverse false claims provision because it covers claims of money owed to the government, rather than payments made by the government") (internal

quotation marks and citation omitted).

A reverse false claim case requires a plaintiff to prove by a preponderance of the evidence: "(1) that the defendant made, used, or caused to be used a record or statement to conceal, avoid, or decrease an obligation to the United States; (2) that the statement or record was false; (3) that the defendant knew that the statement or record was false; and (4) that the United States suffered damages as a result." *United States ex rel. Winslow v. PepsiCo, Inc.*, No. 05-CV-9274, 2007 WL 1584197, at *6 (S.D.N.Y. May 31, 2007) (internal quotation marks omitted) (quoting *United States v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 444-45 (S.D.N.Y. 1999)). Materiality is also a requirement. An alleged "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 192, 136 S. Ct. 1989, 2002 (2016).

The Court addresses obligation, false record or statement, causation, and materiality.[13]  The Court will not address the knowledge element because the parties agree there is a genuine issue of fact concerning whether Maroni knowingly caused a false record to be made.  (Taylor Reply at 2.)  Taylor also has not moved for summary judgment on whether she or the United States incurred damages.[14]

---

[13] Taylor asserts that "Maroni concedes the essential element concerning falsity, obligation and materiality in his Answer and elsewhere."  The support she cites for that proposition, however, shows only that Maroni conceded certain legal principles, not that he admitted that the elements had been established as fact.  (Taylor Mem. at 13 (citing ¶¶ 17-26 of her statement of undisputed facts).)

[14] Through settlement with Samsung, the United States has received both restitution and penalties totaling $1,000,000.  In a sense then, the United States has already been compensated for its damages.  Taylor suggests that she can proceed on a so-called

## A.     Obligation To The Government

"Under any theory of a reverse false claim, ... the relator must allege an 'obligation' to pay money or property to the government." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024).  "The reverse false claim provision defines an 'obligation' as 'an established duty, whether or not fixed, arising from' enumerated sources, including a contractual relationship, a statute, or a regulation.  31 U.S.C. § 3729(b)(3).  Accordingly, the existence of a cognizable 'obligation' turns on whether a duty is 'established' – or whether there is any duty to pay." *Miller*, 110 F.4th at 542-43 (citations omitted).  The requirement to pay customs duties constitutes an obligation to pay money to the government.  *See* S. Rep. No. 111-10, at 14 n.10 (2009) (noting "customs duties clearly fall within the new definition of the term 'obligation'" in the FCA), *as reprinted in* 2009 U.S.C.C.A.N. 430, 444.  It is undisputed that Belovefine and GMI had the obligation to pay customs duties and fees for the imported footwear.  (Supp. Choi Decl. ¶ 3; *see also* Second RFA ¶ 34 (Maroni admitting that "Customs duties are typically, but not always assessed on imported footwear").)  Taylor is entitled to summary judgment on the issue of whether there was an obligation to the government.

---

"penalties only" case against Defendants without need to prove economic damages. (Taylor Mem. at 4 n.5.)  The issue, mentioned only in a footnote, has not been sufficiently briefed.  The Court therefore does not make any determination with respect to the damages element.  *See Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104, 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017) (courts "routinely decline[ ] to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised"); *In re Crude Oil Commodity Litigation*, No. 06-CV-6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 8, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived").

## B.    False Record Or Statement

In general, several former employees attest that in the course of their employment at GMI and Belovefine they created or altered Footwear Declarations and Forms 7501 with false information so that the companies could pay a lower duty rate.  (*See e.g.,* McInnis Ex. K at ECF 4 (email dated 2/21/2017 from Spano employee to Bailey about problematic HTS codes); Jimenez Decl. ¶¶ 11-13 (recounting having "no choice but to change the IFIs" for the Ben Sherman espadrilles GMI imported to "make it look like they had flocking on the outer soles" to get the lower duty rate); Sotomayor Decl. ¶¶ 17-21 (describing being instructed by Bailey to "amend" Footwear Declarations for Ben Sherman shoes by changing the Footwear Declarations to reduce the duty rates); Bailey Decl. ¶¶ 15-18 (attesting that he observed GMI and Belovefine employees obtaining incorrect duty rates by falsifying data on Footwear Declarations).)  Taylor similarly testifies that that she "personally saw many instances" where misrepresentations concerning the classification of specific footwear shoes styles were made on Customs forms.  (*See* Taylor Decl. ¶¶ 76-82.)  For all shoe styles about which he was asked, however, Maroni denies that the correct HTS codes were ones associated with higher duty rates, and, as relevant to the respective style, denies that the style had foxing (as would carry a higher duty rate) or did not have flocking (as would carry a higher duty rate).  (*See* Second RFA ¶¶ 46-47, 49-50, 52 (denying that HTS codes were incorrect for Ben Sherman, Knox, Vince, Vaughn, Presley, Parnell styles, among others), 48 (denying certain Ben Sherman styles did not have flocking), 51 (denying Ben Sherman Oxford Parnell had foxing).)  In other words, Maroni denies that GMI and Belovefine provided false information about the shoes.

Beyond the general, however, there is no indisputable proof in the record that proves falsity.  As evidence of false records or statements, Taylor attaches (1) various emails between GMI/Belovefine employees and Spano concerning footwear classifications; (2) third-party evaluations of four footwear styles;[15] and (3) a single revised Form 7501 submitted by Spano to Customs.  That evidence, along with the employees' and Spano's declarations, tell only a partial story.  That is because those records, with one exception, do not mention any of the styles Taylor asserts are implicated in the scheme, nor do they demonstrate falsity of the statements made.

To start, none of the emails reference the styles of footwear that Taylor asserts are at issue in the scheme.  To be sure, some email communications reveal inconsistencies concerning the material makeup of certain unspecified footwear styles prior to their import (*see, e.g.*, McInnis Exs. K at ECF 4 ("documents [Spano is] receiving from origin for [GMI/Belovefine] shipments – do not match the recap/HTS [GMI/Belovefine] are requesting that [Spano] use"); Ex. O at ECF 7 ("[Spano has sent] another shipment with discrepancies between the Invoice HTS number and the IFI's").)  But without more, those inconsistencies do not prove that any particular inconsistency was false.

The evaluations do not fare any better or demonstrate the falsity of any inconsistency.  For example, the evaluation of the "Ben Sherman Knox" shoe concluded it "has an upper predominantly of rubber/plastic," a "foxing-like band," and should be classified under HTS code "6402.99.8005 which is dutiable at 90 cents/pair + 20 percent." (McInnis Ex. 11 at ECF 1.)  But neither the evaluation report nor any other evidence

---

[15] Taylor submits third-party evaluations concerning four footwear styles: (i) "Ben Sherman Knox"; (ii) "Vaughn/Vance"; (iii) "Preston/BN7S00061"; and (iv) "Oxford Parnell Men's Shoe Style BNM00009."  (McInnis Exs. 11-13 and S.)

indicates what specific Knox style was evaluated by the third party.  The Court has no basis to find that the shoe style evaluated is, in fact, the Knox style Taylor testified she saw was reported as not having foxing.[16]  (*Compare* Taylor Decl. ¶ 76(e), *with* McInnis Ex. 11 at ECF 1.)  And, while there is an email exchange in which GMI employee Jimenez informs Spano "[a]s per the factory and revised IFI the knox does not have a foxing" (*see* McInnis Ex. J), those emails concerned styles BN400229 and BN600013 (*see* McInnis Ex. O).  Yet those styles are not mentioned in the Knox evaluation, nor are they identified by Taylor as being a part of the alleged scheme.  (*See* Taylor Decl. ¶ 76.)

The evaluation report concerning the "Vaughn/Vance" shoe is similarly untethered to the specific styles Taylor identifies as being part of the scheme.  Like the Knox evaluation, the Vaughn/Vance evaluation does not specify which specific shoe style was evaluated.  (*See* McInnis Ex. 12.)  Nor is there any evidence that a GMI or Belovefine employee provided information that was not consistent with the evaluation. In other words, there is no evidence in the record to show that GMI or Belovefine made representations contrary to the information found in the Vaughn/Vance evaluation.

That leaves two remaining evaluations which do reference specific style numbers, one analyzing Preston BN7S00061, and the other Oxford Parnell Men's Shoe Style BNM00009.  (*See* McInnis Exs. 13 and S.)    As to the latter, there is no evidence in the record that false statements were made regarding that particular style.  Neither Taylor, or any other declarant, attest to misrepresentations concerning style BNM00009, and there

---

[16] To the extent "Knox" is considered a style, that name denotes a line of variously styled shoes that each are a distinct sub-style.  For instance, some Knox style shoes have flocking and some do not.  (*Compare* McInnis Ex. X at ECF 5 (showing Knox style with a "TPR/FLOCKED" sole) *with* McInnis Ex. Y at ECF 3 (showing Knox style with a "TPR" sole).)  Without identification of the specific substyle, the evaluation of the "Knox" shoe is not helpful.

are no documents showing that GMI or Belovefine employees provided information to Spano about that style that was not consistent with the evaluation.

The evidence of falsity is also not indisputable with respect to the fourth and final evaluation for the Preston style BN7S00061, even though mention of that style appears more frequently in the record.  The evaluation shows that BN7S00061 has an upper of "rubber/plastic" and a "foxing-like band."  (*See* McInnis Ex. 13 at ECF 1.)  The line sheets for that shoe, however, do not mention whether it does or does not have foxing; they only describe the shoe as having a non-rubber/plastic upper made of "Canvas+Suede," a textile lining, and a flocked sole.[17]  (*See* McInnis Ex. X at ECF 5.)  Taylor says she personally "saw" misrepresentations made by GMI and Belovefine employees indicating that BN7S00061 did not have foxing without further elaboration of what specifically she saw (e.g., a phone discussion, an email, a form, something else?).  (*See* Taylor Decl. ¶ 76(j).)  Meanwhile, Maroni denies that the HTS Codes provided by GMI and Belovefine for this shoe style were false.  (*See* Second RFA ¶ 47(f) (denying that HTS codes were incorrect for Preston style).)  And, as discussed below with respect to causation, there is no evidence in the record that false information about style BN7S00061 was ever presented to Customs.

The lone Form 7501 relied on by Taylor also fails to establish falsity of a record or statement.  Spano testifies that, at GMI's and Belovefine's direction, it revised Forms 7501 that it had submitted to Customs to match product descriptions it received from GMI and

---

[17] The record does not explain the reason for the apparent discrepancy between the line sheet and the evaluation regarding the composition of this footwear style's upper. Perhaps the line sheet is not correct, or perhaps the evaluation contains an error.  Or, there may be some other reason the Court has not considered.  In any event, the inconsistency and lack of explanation only underscore the lack of clarity in the record.

Belovefine.  (*See* Mallinson Decl. ¶ 47.)  As support, Spano attaches a Form 7501 it completed for style BN6F00188, dated August 5, 2016 (the "Original Form 7501"). (Mallinson Decl. Ex. D1.)  The Original Form 7501 shows style BN6F00188 had a duty rate of 20% plus $0.90 per pair.  (*Id.*)  At some point after issuing the Original Form 7501, a GMI or Belovefine employee asked Spano to revise the form to reflect a new duty rate of 6%.  (*See* Mallinson Decl. ¶ 47 and Ex. D2 at ECF 21.)  There is thus evidence to support that Spano revised Forms 7501 to lower the duty rate based on new information provided by GMI or Belovefine.  But there is no evidence that the revised 7501 contained false information about style BN6F00188 or that style BN6F00188 did not actually warrant the lower duty rate.  Rather, Spano only testified that this revision was an example of the "discrepancies" it saw between the data it received from the manufacturer and the data GMI and Belovefine were asking Spano to use.  (Mallinson Decl. ¶¶ 46-47.)

In short, Taylor has failed to meet her burden to demonstrate GMI or Belovefine's provision of false information to Spano (or Worldwide for that matter) for the shoe styles she asserts were included in the scheme.  Accordingly, Taylor is not entitled to summary judgment on the element of false record or statement.

## C.    Causation

The False Claims Act imposes liability on a person who "knowingly … **causes**" a false record or statement "to be made or used."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Maroni thus cannot argue, as he does, that he and his companies cannot be liable merely because Samsung purportedly made "the final determination of HTSUS codes."  (Maroni Opp. at 3.)  *See Tanner v. United States*, 483 U.S. 107, 129, 107 S. Ct. 2752 (1987) ("the fact that a false claim passes through the hands of a third party on its

way from the claimant to the United States does not release the claimant from culpability under the Act"); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp.2d 436, 445 (S.D.N.Y. 1999) ("The statute is violated not only by a person who makes a false statement or a false record ..., but also by one who engages in a fraudulent course of conduct that causes the government to lose money by honoring a false claim") (internal quotation marks, brackets, and citation omitted).

To show causation, Taylor must demonstrate that Defendants' conduct was a "substantial factor in bringing about [the] filing" of a false claim and that the filing was "a normal consequence of the situation created by that scheme." *See United States v. Teva Pharmaceuticals USA, Inc.*, No. 13-CV-3702, 2019 WL 1245656, at *25 (S.D.N.Y. Feb. 27, 2019) (internal quotation marks and citation omitted). The "caused" submission of a false claim must be the "natural, ordinary and reasonable consequence of one's conduct." *United States v. Spectrum Painting Corp.*, No. 19-CV-2096, 2020 WL 5026815, at *10 (S.D.N.Y. Aug. 25, 2020) (internal quotation marks omitted) (quoting *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp.3d 186, 195 (S.D.N.Y. 2016)).

It is undisputed that GMI and Belovefine provided information about footwear characteristics, including foxing and flocking, to Spano (and later Worldwide) for submission to Customs.   Taylor has not provided any proof, however, that Spano (or Worldwide) actually filed false information with Customs that it received from GMI or Belovefine.  As noted above, there is only one Form 7501 in the record, and it does not pertain to any of the shoe styles Taylor identifies as being part of the scheme.  Although Spano explains it routinely filed revised Forms 7501 with Customs, Spano does not aver that any false information was actually filed with Customs or that Spano filed with Customs

any specific information that the record otherwise demonstrates to be false.  The record thus is devoid of evidence demonstrating the requisite causation.

Indeed, as explained above, while there is testimonial evidence that various former GMI and Belovefine employees altered Footwear Declarations and commercial invoices, there is no evidence demonstrating that GMI or Belovefine provided false information for the particular shoe styles that Taylor identifies as being part of the scheme.  Without proof of falsity, the Court has no basis to determine if GMI and/or Belovefine employees caused false statements to be made.  The lack of such evidence is all the more notable given the findings Taylor proposed be included in her otherwise detailed Proposed Order, which vaguely states that "at various times" GMI and Belovefine employees "took steps" to influence Spano to submit forms to Customs that were false.  (*See* Dkt. 99 ¶ 23.)

In her reply, Taylor states that Maroni "acknowledges for the first time" in his opposition brief that GMI and Belovefine employees (i) "had a 'direct influence on Customs Classifications'" and (ii) "took deliberate steps to get the companies' footwear misclassified."  (Taylor Reply at 3.)  The first statement is correct as a general matter; the second statement inaccurately describes what Maroni actually says.  The passage cited from Maroni's opposition is denominated as "Direct Influence on Customs Classifications" and essentially attempts to place any blame with respect to customs issues on Bailey.  (*See* Maroni Opp. at ECF 9.)  Maroni asserts that Bailey "manage[d] customs processes independently" and describes Bailey's motivation and authority "to ensure that operational decisions, such as customs classifications, were carried out in a way that aligned with the company's profitability goals."  (*Id.*)  The Court agrees that Maroni implicitly acknowledges that his companies influenced customs classifications by providing information about the

footwear to the customs broker.  The passage cited, however, does not admit to any steps – deliberate or otherwise – to misclassify the companies' footwear.[18]  Taylor is not entitled to summary judgment that GMI and Belovefine caused false information to be submitted to the government.

Moreover, Taylor's motion is directed at Maroni's, not the companies', conduct. (Taylor Mem. at 2.)  In that respect, Taylor also is not entitled to summary judgment.  The record reveals a genuine dispute as to what Maroni's personal role was in the scheme, and thus to what extent Maroni caused any false statements to be made.  Even Taylor acknowledges that Maroni's "personal role in" the scheme is in dispute.  (Taylor Mem. at 13.)

On one hand, there is considerable evidence that Maroni was directly involved in and responsible for the scheme.  Records show that Maroni had some understanding of the customs process.  For example, Maroni discussed Footwear Declarations with his employees, implying he would have some familiarity and involvement in the duty classification process.  (*See* Second RFA ¶ 8 (Maroni admitting to speaking to employees

---

[18] Taylor's reply also asserts that GMI and Belovefine "have already been deemed liable to Taylor because they defaulted in this action."  (Taylor Reply at 6.)  That is partially true. By virtue of failure to appear by new counsel, both corporate defendants defaulted, as a result of which the Clerk of Court issued a Certificate of Default.  (Dkt. 94.)  If, at the appropriate juncture, Taylor moves for default judgment against GMI and Belovefine, the Court may deem their default as admission to the well-plead allegations of the complaint. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint") (internal quotations marks and citation omitted).  That does not mean, however, that the Court can do so presently for purposes of summary judgment with respect to Maroni.  That is so at least in part because of the potential for inconsistent judgments.  *See Moore v. Booth*, 122 F.4th 61, 67 (2d Cir. 2024) (explaining why it was error to enter default judgment against some defendants while dismissing the claim as to another defendant). The Court therefore does not ground its causation finding in the companies' default, but instead in the summary judgment record as discussed above.

about IFIs); Bailey Decl. ¶ 15 (stating Maroni pressured him to get lower duty rates); Greenstein Decl. ¶ 12 (reviewing margin reports with Maroni); Jimenez Decl. ¶ 10 (discussing customs classifications with Maroni).)  As the CEO and owner of GMI and Belovefine, Maroni would have a motive to reduce the duty rates his companies would be charged.  (*See* Greenstein Decl. ¶ 12 ("When reviewing margins with Mr. Maroni that involved higher duty rates, I was told the company doesn't pay more than 6%").)  And, several employees attest that Maroni directed them to falsify the information on the forms that Spano would use to submit to Customs.  (*See, e.g.*, Taylor Decl. ¶ 48 ("Maroni would get us to falsify IFIs that caused Spano to list HTS codes for certain items of our footwear as if they:  (a) were manufactured without 'foxing or a foxing-like band,' when, if [sic] fact, they actually had foxing or a foxing-like band; and (b) were manufactured with 'flocking,' when, in fact, they were not manufactured with flocking"); Bailey Decl. ¶ 15 (Maroni "would resort to just about every means possible … to coerce [employees] to get the footwear's duty rates into his desired range"); Greenstein Decl. ¶ 13 ("Maroni… often repeated like a mantra he[] [']would not pay more than 6%' duties on his shoes – and became agitated when faced with the prospect of having to pay duties significantly higher than that because of its effect on [the companies'] margins"); Jimenez Decl. ¶ 10 ("[Maroni] would say things to me like, 'We need to get the proper margins.'  Or, 'We have to make revenue'").)

On the other hand, Maroni denies having personal knowledge of the HTS codes used for classifying imported footwear (*see* Second RFA ¶ 36; Maroni Dep. 95:25-96:16), and denies giving employees instructions to falsify HTS codes to pay lower duty rates. (Third RFA ¶ 11.)  The evidence of Maroni's participation and knowledge comes from what former employees claim they had heard or had been told.  As a result, determining

whose version of events is factually true to a large degree turns on the parties' and witnesses' credibility, which the Court may not assess on summary judgment.  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000)).  As such, there is a genuine question of fact as to whether Maroni caused false statements to be made, and summary judgment on that issue must be denied.

## D.    Materiality

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4); *see also United States ex rel. Lahijani v. Delta Uniforms, Inc.*, No. 19-CV-3290, 2024 WL 3536880, at *6 (S.D.N.Y. July 25, 2024) (same).  "[R]elevant factors in evaluating materiality include:  (1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was minor or insubstantial."  *Foreman*, 19 F.4th at 110 (internal quotation marks omitted) (citing *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 136 S. Ct. 1989 (2016)).

It is undisputed that Customs relied on the information on the Forms 7501 and Footwear Declarations in calculating the correct customs duty rate.  (Taylor 56.1 ¶ 23; FAC ¶ 105; Answer ¶ 105.)  It is also undisputed that tariff classification codes, duty rates, and duty amounts owed for imported footwear on Customs documents are material to Customs.  (Taylor 56.1 ¶ 23; FAC ¶ 104; Answer ¶ 104, *but see* Second RFA ¶¶ 40, 44

(objecting to RFA on the basis that it calls for a conclusion of law, but denying if a response is required, that Form 7501 and Footwear Declaration are records or statements material to an obligation to pay or transmit money to the government).)   Accordingly, Taylor is entitled to summary judgment on the issue of materiality.

To sum up, summary judgment is granted in Taylor's favor with respect to the reverse FCA claim elements of (i) obligation and (ii) materiality.   Summary judgment is denied with respect to false statement or record and causation.

## II.    Retaliation Claim

Taylor does not appear to move for summary judgment with respect to her retaliation claim.   Her argument as to material facts not in genuine dispute does not address the issue (*see* Taylor Mem. at 11-13); her reply brief does not argue for it; and her proposed order contains no findings as to retaliation (*see* Dkt. 99).   Her opening brief, however, recites legal standards applicable to an FCA retaliation claim.   (*See* Taylor Mem. at 6-7.)   Accordingly, the Court briefly explains why it will not grant summary judgment in favor of Taylor on her retaliation claim.

The False Claims Act makes unlawful retaliatory action towards an employee for contesting – i.e., "blowing the whistle on" – their employer's conduct violating the Act. *See* 31 U.S.C. § 3730(h).   To establish a whistleblower retaliation claim under the FCA, courts "have generally required a plaintiff to show that (1) [the employee plaintiff] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [the plaintiff] because he engaged in the protected activity."   *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017).   Adverse employment

33

action includes constructive discharge. *See United States ex rel. Lee v. Northern Adult Daily Health Care Center*, 205 F. Supp.3d 276, 299 (E.D.N.Y. 2016) (holding in FCA case that "where a plaintiff alleges that he has been discharged in retaliation for engaging in protected conduct, he must plead facts to show that he was directly terminated or that 'his employer, rather than discharging him directly, intentionally create[d] a work atmosphere so intolerable that he [was] forced to quit involuntarily'") (alterations in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003)).

Each element of Taylor's FCA retaliation claim turns on evidence pitting Taylor and Maroni's credibility against each other. Taylor offers only her own testimony that she repeatedly complained to Maroni about the Customs scheme and that he threw objects and yelled at her in response, culminating in her constructive discharge. Maroni denies all aspects of Taylor's retaliation claim, including that Taylor complained to him about the Customs scheme, that Maroni engaged in any of the acts of retaliation of which Taylor accuses him, and that he effectively discharged her because of those acts. Maroni argues that Taylor's credibility "is questionable" and that Taylor has "financial motive" behind her retaliation claim. (Maroni Opp. at ECF 3, 9-10.) Aside from Taylor's Declaration and Maroni's deposition testimony, the record does not contain any statements from other employees who may have seen Taylor go to Maroni to complain, calendar entries for such meetings, or emails or other evidence to support either party's account. As even Taylor's attorney acknowledged by soliciting an affirmative answer from Maroni, the retaliation claim is "[a] case of [Maroni's] word against [Taylor's]." (Maroni Dep. 87:3-8.)

Where, as here, the record presents "a question of 'he said, she said,'" the Court "cannot ... take a side at the summary judgment stage." *Fincher v. Depository Trust &*

*Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Bale v. Nastasi*, 982 F. Supp.2d 250, 258-59 (S.D.N.Y. 2013) ("Where each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court"). Accordingly, summary judgment cannot be granted on any element of Taylor's retaliation claim.

### III.    Alter-Ego Liability

Invoking the alter-ego and veil-piercing theories of liability,[19] Taylor seeks summary-judgment findings that (1) Maroni is subject to individual liability,[20] and (2) GMI

---

[19] "The federal courts have long held that under New York law, the concepts of alter ego liability and veil-piercing liability 'are indistinguishable, do not lead to different results, and should be treated as interchangeable.'" *In re Stage Presence, Inc.*, 592 B.R. 292, 298 (Bankr. S.D.N.Y. 2018) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)), *aff'd*, No. 18-CV-10662, 2019 WL 2004030 (S.D.N.Y. May 7, 2019); *see also MWH International, Inc. v. Inversora Murten, S.A.*, No. 11-CV-2444, 2015 WL 728097, at *11 (S.D.N.Y. Feb. 11, 2015) (explaining that although "some courts have distinguished these two concepts on the ground that alter ego claims are premised on direct liability, while veil piercing claims are premised on vicarious liability[,] [u]nder New York law as interpreted by the Second Circuit, … these two concepts are, at least as a practical matter, identical") (citation omitted). The Court thus uses the terms alter ego and veil-piercing interchangeably for purposes of summary judgment.

[20] Even absent an alter-ego finding, Maroni can be held individually liable if the elements of Taylor's FCA claim are satisfied as to him. *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp.2d 313, 331 (S.D.N.Y. 2004) ("Section 3729(a)(7) imposes liability for 'reverse false claims,' providing that 'an **individual** who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the act as if he had submitted a false claim to receive money'") (emphasis added) (citation omitted). As discussed more expansively below, the same cannot be said for Taylor's FCA retaliation claim. *See, e.g.*, *United States ex rel. Brumfield v. Narco Freedom, Inc.*, No. 12-CV-3674, 2018 WL 5817379, at *2 (S.D.N.Y. Nov. 6, 2018) (explaining that "the overwhelming majority of courts" have held that individual liability cannot be imposed under § 3730(h), whether that individual is a supervisor, CEO, or owner).

The Court understands Taylor's argument that Maroni is the alter ego of his companies to be asserted as an alternative basis for individual liability for the reverse FCA claim (in the event, for example, Taylor does not prove Maroni's individual

and Belovefine are jointly and severally liable for all claims.  Taylor has not met her burden to demonstrate that she is entitled to summary judgment in either respect.

## A.    Alter-Ego And Veil-Piercing Standard

Because GMI and Belovefine are privately held New York corporations, New York law controls.  *See Taizhou Zhongneng Import & Export Co. v. Koutsobinas*, 509 F. App'x 54, 56 n.2 (2d Cir. 2013) (summary order) ("New York's choice of law rules provide that 'the law of the state of incorporation determines when the corporate form will be disregarded'") (quoting *Fletcher v. Atex*, 68 F.3d 1451, 1456 (2d Cir. 1995)); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp.3d 461, 474 (S.D.N.Y. 2017) (same).  "To pierce the corporate veil under New York law, a plaintiff must establish (1) 'that the owner exercised complete domination over the corporation with respect to the transaction at issue' and (2) 'that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'"  *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp.3d 716, 726 (S.D.N.Y. 2017) (quoting *Thrift Drug, Inc. v. Universal Prescription Administrators*, 131 F.3d 95, 97 (2d Cir. 1997)).  "While complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party

---

knowledge or involvement), and as a means of subjecting Maroni to individual liability for retaliation.  The Second Circuit has not weighed in on whether a § 3730(h) retaliation claim can be brought against an individual through veil-piercing or as the alter ego of an employer corporation.  Some courts within the Circuit, however, have at least entertained the possibility.  *See, e.g.*, *Brumfield*, 2018 WL 5817379, at *3 (S.D.N.Y. 2018) (citing cases and finding that relators did not sufficiently allege alter ego).  Some courts outside the Circuit have not.  *See United States ex rel. Friddle v. Taylor, Bean & Whitaker Mortgage Corp.*, No. 06-CV-3023, 2012 WL 1066510, at *6 (N.D. Ga. March 27, 2012) ("[R]elators argue that [individual defendants] can be considered to be employers under an 'alter ego' or 'corporate veil piercing' theory.  Relators do not point to any binding or persuasive authority that these common law doctrines can give rise to liability when the relevant statute does not do so").

seeking piercing] is required." *In re Platinum-Beechwood Litigation*, 427 F. Supp.3d 395, 445 (S.D.N.Y. 2019) (quoting *Morris v. New York State Department of Taxation & Finance*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 811 (1993)).

In assessing whether to pierce the corporate veil, the Court considers several factors.   These include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders*, 933 F.2d at 139; *see also Cardell Financial Corp. v. Suchodolski Associates*, No. 09-CV-6148, 2012 WL 12932049, at *20 (S.D.N.Y. July 17, 2012) (listing similar factors), *R. & R. adopted*, 896 F. Supp.2d 320 (S.D.N.Y. 2012). "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative.  Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax Film Corp. v. Abraham*, No. 01-CV-5202, 2003 WL 22832384, at *8 (S.D.N.Y. Nov. 25, 2003).

Courts review a similar set of factors when determining whether a corporation is the alter ego of another.  *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 116 F. Supp.3d

349, 356-57 (S.D.N.Y. 2015).  The primary concern of such an inquiry is "(1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness."  *Milestone Shipping, S.A. v. Estech Trading LLC*, 764 F. Supp.2d 632, 636 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 177 (2d Cir. 2008)).

The Court first considers whether GMI and Belovefine are alter egos of each other and operated as a single economic entity.  The Court then addresses whether Maroni may be deemed the alter ego of either or both GMI and Belovefine.

**B.     GMI and Belovefine**

Taylor argues there is a "complete identity" between GMI and Belovefine, permitting the Court to pierce the corporate veil and find the companies jointly and severally liable on all claims.  (Taylor Mem. at 13.)  But Taylor has not met her burden to prove that no reasonable trier of fact could find in Maroni's favor on the issue of whether GMI and Belovefine are alter egos of each other.

Some factors weigh in favor of finding that GMI and Belovefine operated as the same entity.  For example, GMI and Belovefine both were operated and controlled by the same individual, Maroni.   (First RFA ¶ 19 (admitting Maroni is CEO of GMI and Belovefine).)  GMI and Belovefine also shared a common office (and mailing address) in New York City for which GMI did not pay any rent.   (*Id.* ¶ 11 ("GMI USA Corp. and Belovefine, Ltd. occupied … the same premises … at 3 Columbus Circle, New York, New York 10019"); McInnis Ex. CC (Lease Agreement listing only Belovefine as the tenant); Maroni Dep. 41:12-42:8; Taylor Decl. ¶ 22.)

However, and despite Taylor's assertion that Maroni told her there was no practical difference between the two companies and that he used the names interchangeably merely for accounting purposes (Taylor Decl. ¶ 23), other factors weigh against such a finding.  There is proof that the entities were formed as separate legal entities (First RFA ¶¶ 1, 3), had separate payroll accounts (*id.* ¶¶ 9-10), and had separate bank accounts, even if at the same bank (*id.* ¶¶ 5, 6, 8; Maroni Dep. 49:14-19).  While the entities shared a CPA (Maroni Dep. 49:20-24), there is no evidence the accountant maintained joint records for the entities.  Nothing in the summary judgment record before the Court indicates an absence of corporate formalities at either company, or that either company was inadequately capitalized.

Taylor asserts that the companies had around 20 overlapping employees at any given time, as evidenced by the payroll records and employee rosters for each company. (*See* McInnis Exs. DD, OO, PP, KK, LL.)  But Taylor does not identify specifically which employees worked for both entities, the time period during which employees overlapped, or which entries in the payroll accounts reflect shared employees.  Though Maroni admits that one employee, Brad Hren, the head of sales, received payroll payments from both GMI and Belovefine, Maroni denies that was so for any other employee.  (First RFA ¶¶ 22-31; Maroni Dep. 23:3-9 (testifying that employees who worked for Belovefine did not work for GMI).)  Moreover, there is evidence suggesting that employees did not overlap, but instead worked for each company, independently, at different times.  For example, Taylor initially was hired at GMI as Production Manager.  (Taylor Decl. ¶¶ 15-16).  In April 2016, Taylor's email changed from "dtaylor@gmi-usa.com" to "dtaylor@belovefineny.com." (*Compare* McInnis Ex. W (2/25/2016 email to Taylor with GMI email address), *with*

McInnis Ex. AA at ECF 2 (04/14/2016 email indicating Taylor's new Belovefine email address); *see also* Taylor Decl. ¶ 18.)  And payroll records indicate Taylor being paid as a Belovefine employee around the same time her email changed in 2016.  (*See* McInnis Ex. LL at ECF 294; Taylor Decl. ¶ 20.)  Competing reasonable inferences may be drawn from such evidence.

It is also unclear whether the companies operated at arm's length and maintained separate finances.  While there is evidence GMI and Belovefine performed identical business functions as demonstrated by (i) the joint operating contract the companies signed with Samsung (*see* McInnis Ex. F) and (ii) emails concerning GMI business sent from employees with "@belovefineny.com" email addresses (*see* McInnis Exs. N, O, R), Maroni testified that Belovefine provided "back-office" services to GMI and worked exclusively with certain designers.  (Maroni Dep. 19:4-10.)  Taylor argues the operating agreement with Samsung proves GMI and Belovefine were treated as a single profit center (*see* Taylor 56.1 ¶ 207(v); *see also* McInnis Ex. F), but the evidence of intermingled finances is mixed.

As evidence of intermingled finances, Taylor cites to "GMI Bank Statements and Belovefine Bank Statements," which, she argues, show that GMI and Belovefine frequently transferred large sums of money between their accounts.  (*See* Taylor 56.1 ¶ 207(i).)  But Taylor submitted 250 pages of bank statements without identifying the relevant pages or entries for the Court.  (*See* Exs. EE, FF, GG, and HH.)  While the Court has carefully reviewed the record, the Court will not serve as an accountant and adduce Taylor's evidence for her motion.  *See Sea Trade Maritime Corp. v. Coutsodontis*, No. 09-CV-488, 2015 WL 4998638, at *4 (S.D.N.Y. Aug. 20, 2015) (declining "to scour the

numerous submissions and in effect become advocates" for the parties, as "judges are not like pigs, hunting for truffles buried in briefs or the record") (internal quotation marks and citations omitted).  Nor will the Court "make a party's arguments for it or fill in the blanks on that party's behalf" where briefing is inadequate.  *Bey v. State of New York,* No. 11-CV-3296, 2013 WL 3282277, at *6 (E.D.N.Y. June 25, 2013) (internal quotation marks and citation omitted).  In any event, to the extent the bank records reflect inter-company transfers, it will be for the factfinder to determine their significance when considered with evidence of the many other factors germane to the alter-ego determination.

Given the assorted evidence of the *Passalacqua* factors and the reasonable inferences that can be drawn from that evidence, a reasonable jury could find that GMI and Belovefine did not operate as alter egos of each other.  Accordingly, summary judgment on that issue must be denied.

## C.    Maroni's Individual Liability

Taylor argues that Maroni failed to treat GMI and Belovefine separate from himself, thus making him individually liable for all claims in the action.  (Taylor Mem. at 13.) Perhaps, but the evidence of record does not preclude a reasonable jury from finding that the corporate veil should not be pierced as between Maroni and his companies.

As explained above, there is evidence of some overlap between Maroni, GMI, and Belovefine.  Maroni controlled and operated both GMI and Belovefine.  (First RFA ¶¶ 11, 19.)  Maroni had sole authority to sign contracts on behalf of GMI and Belovefine.  (Maroni Dep. at 36:16-20.)  Maroni also had control over hiring employees at both entities and, with the assistance of Bailey, running "day-to-day operations" and managing the employees.  (*See, e.g.*, McInnis Ex. V (Taylor accepting job offer from Maroni); *see also*

Maroni Opp. at ECF 3.).  But, there is little evidence that Maroni failed to observe the formalities of corporate existence such as maintaining corporate books and observing corporate procedures.  Nor has Taylor pointed to any evidence that either entity was undercapitalized.

Taylor focuses particularly on whether Maroni used GMI and Belovefine funds for his personal use.  She thus presents undisputed evidence that Maroni received regular payments from both entities in the form of "1099-Misc (Owner Draw) distributions."  (First RFA ¶ 19.)  But the exact nature of those funds, and what they reflect, is far from clear. Were they a proper draw or distribution of profits?  Something else?  The record does not provide an answer.  (*See* Maroni Dep. 69:11-70:20 (Maroni testifying that he did not receive regular compensation as employee but instead received net profit or loss as CEO and owner).)  The Court cannot, based on the current record, draw the inference against Maroni that the 1099 payments were in disregard of the corporate separateness of his companies.

Taylor similarly contends that Maroni used company funds to pay for personal expenses; namely, cleaning services for his personal residence, his children's tuition, Mercedes Benz cars, and vacations.  (Taylor 56.1 ¶¶ 210-20.)  The record, however, is insufficient to establish that assertion as undisputed fact, at least not to the extent Taylor contends.  First, while payroll records show that Maroni paid Canda Hankerson, a maid, from GMI's payroll account (*see* Ex. KK at ECF 25-32; First RFA ¶¶ 32-33), Maroni testified that Hankerson also cleaned the office on some weekends, separate from his personal use of Hankerson's services on weekdays.  (*See* Maroni Dep. 8:9-9:20.)  Maroni has not submitted any evidence that he separately paid Hankerson for her work at his

residence from his personal funds or that Hankerson did any work for GMI other than occasional weekend cleaning that would explain payment to her directly from GMI's payroll account. Even if the record indisputably shows that Maroni used GMI funds to pay Hankerson for personal house cleaning, the same cannot be said for the three other items that Taylor points to as Maroni's payments for personal items from GMI's account.

Second, the evidence Taylor cites as showing that Maroni paid for his children's tuition with company funds does not exist in the summary judgment record. (*See* Taylor 56.1 ¶ 218 (referring to bank statements from 2017 that were not submitted in the record).) Third, Belovefine bank statements do not show payments made to "Mercedes Benz." There is a payment on October 6, 2020, to "MBFS" made from the Belovefine Chase bank account (McInnis Ex. FF at ECF 48), but, even assuming that acronym refers to Mercedes Benz Financial Services, the Court cannot assume that payment was made in connection with a car Maroni had leased for his personal use as opposed to company use. Finally, Maroni testified that he traveled for business to Miami. (*See* Maroni Dep. 32:21-25.) The bank statements that purportedly show Maroni paying for "personal vacations" were made to the "Miami Beach Golf Club." (*See* McInnis Ex. EE at ECF 22, 26 (payments to Miami Beach Golf Club).) To assume that such a trip was for vacation as opposed to business would require the Court to make an inference against Maroni, which the Court may not do on summary judgment.[21]

---

[21] For the same reasons, the Court cannot infer that Maroni committed tax fraud by running personal expenses through the business. Taylor does not provide any specific record citations to support this assertion, but rather states that it is "inferred" generally from the companies' bank statements. (Taylor 56.1 ¶ 221.) Tax fraud would be an improper use supporting Taylor's corporate-veil theory. But the Court cannot properly draw the "inference" of tax fraud against Maroni on summary judgment.

Lastly, Taylor also asserts that Maroni used GMI and Belovefine to commit PPP ("Paycheck Protection Program") loan fraud, another improper purpose.  (Taylor 56.1 ¶ 236.)  Taylor argues Maroni submitted separate PPP loan applications classifying GMI and Belovefine as entities that provided different types of services, and among other things, used overlapping employees to create the illusion of two separate businesses. (Taylor 56.1 ¶¶ 228-30.)  To bolster her claim, Taylor asks the Court to take judicial notice of a settlement agreement in another *qui tam* action for which Taylor was the relator, *United States ex rel. Devyn Taylor v. Stefano Maroni*, No. 23-CV-2159 (S.D.N.Y.) (the "PPP Fraud Action Settlement Agreement"), entered into as of December 5, 2024 and so-ordered by the court on December 12, 2024.

The PPP Fraud Action Settlement Agreement contains admissions from Maroni concerning the nature of the PPP loans.  (*See* Dkt. 107-1 at 4-6.)    While the Court may take judicial notice of public records, like certain filings made in other actions, *see Gallo v. Inter-Con Security Systems Inc.*, No. 20-CV-4879, 2021 WL 3913539, at *1 n.2 (S.D.N.Y. Sept. 1, 2021), such documents typically are not considered for "the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *See Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks omitted) (quoting *International Star Class Yacht Racing Association v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).  The PPP Fraud Action Settlement Agreement, however, is an exception to that rule.  It contains admissions by Maroni, which can be considered for their truth, as they are not hearsay and are offered against Maroni as the opposing party.  *See* Fed. R. Evid. 801(d)(2)(A); *BDG Gotham Residential, LLC v. Western Waterproofing Co.*, 631 F.

Supp.3d 76, 83 (S.D.N.Y. 2022) (considering party admission in deferred prosecution agreement for the truth of the matter).  Nonetheless, with the exception of the first two sentences of Maroni's admissions – which are ambiguous as to time frame – all of Maroni's admissions go to events occurring in 2020 and later.  (*See* Dkt. 107-1 at 4-6.) As that time period does not overlap with the period at issue in this case, the Court cannot assume the same set of facts existed during the 2016-2019 period applicable here.  As recounted above, the evidence in the summary judgment record for that earlier period is not indisputable.

Even though Taylor is not required to show that all the *Passalacqua* factors weigh in favor of her claim, genuine disputes of material fact persist as to a number of those factors.  Therefore, summary judgment as to whether Maroni is personally liable as the alter ego of GMI and Belovefine is denied.

**D.    Taylor's Other Theories Of Maroni's Individual Liability**

Even without establishing alter-ego liability, Taylor suggests that Maroni can be held individually liable for retaliation under § 3730(h).  (*See* Taylor Mem. at 6-7.)  The Court does not agree.  Taylor makes two arguments.  First, she references the 2009 amendments to the FCA, which, among other things, removed reference to an employee's "employer" in § 3730(h).  Taylor asserts that, particularly after that change, "under some circumstances" – which she does not identify – an individual can be liable for FCA retaliation.  But as Taylor acknowledges, that is a minority view and has been rejected in this District.  *See Diffley v. Bostwick*, No. 17-CV-1410, 2017 WL 6948358, at *2-4 (S.D.N.Y. Dec. 6, 2017) (joining "the overwhelming majority of courts" holding that

elimination of the term "employer" from § 3730(h) does not create a basis for liability of an individual supervisor).

Second, Taylor argues that even if liability for FCA retaliation can only be imposed upon an "employer," Maroni was Taylor's employer.  As support, Taylor cites *Bernstein v. Silverman*, No. 20-CV-630, 2024 WL 3595621, at *31 (N.D.N.Y. July 31, 2024).  (*See* Taylor Mem. at 7.)  That case, however, addressed employer status under the New York Labor Law.  Taylor has not cited any authority that Maroni can be held individually liable for false claim retaliation as Maroni's employer under the FCA.  To the contrary, the law in this District is clear that no individual liability (without alter-ego status) exists for retaliation under the FCA.  *See Aryai v. Forfeiture Support Associates*, 25 F. Supp.3d 376, 387 (S.D.N.Y. 2012) ("[S]ection 3730(h) does not provide a cause of action against individual defendants"); *Fisch v. New Heights Academy Charter School*, No. 12-CV-2033, 2012 WL 4049959, at *4 (S.D.N.Y. Sept. 13, 2012) ("Section 3730(h) imposes liability only on employers"); *see also Krause v. Eihab Human Services, Inc.*, No. 10-CV-898, 2015 WL 4645210, at *16 (E.D.N.Y. Aug. 4, 2015) ("Courts in this Circuit have repeatedly held that there is no individual liability under the FCA"); *Monsour v. New York State Office for People with Developmental Disabilities*, No. 13-CV-336, 2014 WL 975604, at *10 (N.D.N.Y. March 12, 2014) ("an individual may not be sued under § 3730(h) … either in an individual or official capacity; liability may only be imposed on employers").  Accordingly, summary judgment as to this issue is denied.

## CONCLUSION

For the forgoing reasons Taylor's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.  Specifically, summary judgment is granted

in Taylor's favor with respect to reverse FCA claim elements of obligation to the government and materiality.  Summary judgment is denied in all other respects.

The parties shall meet and confer and by March 27, 2025, shall jointly file a letter identifying what dates they are **not** available for trial in June, July, August, September, and October 2025.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  March 13, 2025
     New York, New York

Copies transmitted this date to all counsel of record.